LUERANA PIGMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 62607.   Filed November 13, 1958.

*Ouster W. Sandlin, Esq.*, for the petitioner.
*Carswell H. Cobb, Esq.*, for the respondent.

FISHER, *Judge:* This proceeding involves deficiencies in income tax and additions to tax determined against petitioner as follows:

| Year | Deficiency | Additions to tax under | | |
| | | Sec. 293 (b) | Sec. 294 (d) (1) (A) | Sec. 294 (d) (2) |
| --- | --- | --- | --- | --- |
| 1947 | $6,063.16 | $3,031.58 | $546.48 | $364.33 |
| 1948 | 12,935.04 | 6,467.52 | 1,164.71 | 776.46 |
| 1949 | 7,616.91 | 3,808.46 | 687.06 | 458.03 |
| 1950 | 28,971.17 | 14,485.59 | 2,607.41 | 1,738.27 |
| 1951 | 53,941.82 | 26,970.91 | 4,847.47 | 3,231.65 |
| 1952 | 9,477.48 | 4,738.74 | 845.68 | 563.79 |
| | 119,005.58 | 59,502.80 | 10,698.81 | 7,132.53 |

The issues presented for our consideration are: (a) Whether, and to what extent, petitioner omitted taxable income from her return for each of the years 1947, 1948, 1949, 1950, 1951, and 1952; (b) whether any part of the deficiency for each of the years in question is due to fraud with intent to evade tax; (c) whether the deficiencies for the years 1947 through 1951 are barred by the statute of limitations; and (d) whether the petitioner is liable for additions to tax under section 294 (d) (1) (A)[1] for failure to file declarations of estimated tax, and section 294 (d) (2) for substantial underestimation of the estimated tax, for all the years in question.

FINDINGS OF FACT.

Some of the facts are stipulated and to the extent so stipulated are incorporated herein by reference.

---

[1] All statutory references are to the Code of 1939.

Petitioner, Luerana Pigman, is an unmarried individual presently residing in Oklahoma City, Oklahoma. She filed timely income tax returns for the calendar years 1947, 1948, 1949, 1950, and 1951 with the then collector of internal revenue for the first district of Illinois. Her income tax return for the calendar year 1952 was filed with the district director of internal revenue at Oklahoma City, Oklahoma.

Petitioner was born in Mountaintop, Arkansas, in 1902. She completed grammar school and attended the Y. M. C. A. Central High School in Chicago and the Englewood High School, Chicago, both for approximately 1 year. Prior to the period here in issue, she worked as owner and manager of various hamburger stands; manager, hostess, and cashier of various restaurants; and as a clerk and examiner for the United States Army Quartermaster Depot, Chicago. At the present time she is a one-half owner of an employment agency.

During the period in issue and until January 1953, petitioner resided in Berwyn, Illinois, a suburb of Chicago.

Sometime in 1944, petitioner met Fannie May Scoville who resided at the Blackstone Hotel, Chicago. Their first meeting occurred at a body massage parlor in Chicago where petitioner was telling fortunes for those who displayed an interest. Her fortunetelling was for amusement purposes and no charges were made therefor.

Fannie May Scoville (who used other names on occasion) is an eccentric, wealthy widow who was in fear of her stepson who, she believed, was threatening her and trying to gain control of the estate she received from her husband.

After their first meeting at the massage parlor, Fannie May visited petitioner at her home. Petitioner told Fannie May that she had some experience in investigative work and that she could help with her (Fannie May's) difficulties.

In connection with her fear of her stepson and her attempts to protect her money, Fannie May engaged petitioner to make a trip to California in 1945 to seek out information about certain persons whom her stepson knew. Fannie May provided petitioner with a list of these persons and petitioner gave her a written report regarding some of the people listed, as well as others, and, in addition, noted the results of her investigation on the lists furnished by Fannie May.

Petitioner, during the years in issue, continued to do investigative work for Fannie May and made several trips to California in this connection. She made numerous other reports to Fannie May but all were oral. Petitioner reported that she had uncovered and squelched threats against Fannie May. She also reported that an attempt had been made to dope Fannie May which needed investigating and that she would have people watch over her and protect her from harm.

In addition to the reports on Fannie May's stepson, petitioner informed her on the activities and attitudes of various other persons

with whom Fannie May had social and business relations. Petitioner also advised Fannie May on real estate matters, both as to realty in general and information about specific real estate brokers.

Petitioner's link with Fannie May was more than a mere business relationship. They had a social kinship in which petitioner acted as a companion, friend, and confidant to Fannie May. They went on motor trips together and visited each other's residence or telephoned each other almost daily during the years involved.

During the years in question, Fannie May made gifts of money and other property to various persons in whom she had taken an interest. She made a $500 gift to petitioner to cover some medical expenses in an unspecified year.

Fannie May, on occasion, carried large amounts of cash on her person which at times amounted to $15,000 or more.

Fannie May made numerous payments to petitioner during the years in question which were intended as compensation for services rendered and expenses incurred in the investigative work that petitioner engaged in or had hired others to carry out.

A substantial portion of the moneys received by petitioner from Fannie May in each of the years 1947 through 1952 was deposited in petitioner's name in the following banks:

> National Bank of McAlester, McAlester, Oklahoma
> First National Bank of Chicago, Chicago, Illinois
> Drexel National Bank, Chicago, Illinois
> Berwyn National Bank, Berwyn, Illinois
> Liberty National Bank and Trust Company, Oklahoma City, Oklahoma
> Newport Harbor Bank, Corona Del Mar, California

During the years 1947, 1948, and 1949, petitioner was also engaged in the real estate business as a broker in Chicago. During a part of the year 1950 and for the year 1951, petitioner owned and operated the Luerana Beauty Shop in Berwyn, Illinois, and was also engaged in buying and selling stocks. In 1952, petitioner also bought and sold stocks as an investment. All of the above occupations were in addition to the investigative services performed for Fannie May.

During 1950 and 1951, petitioner opened and maintained a checking account at the Berwyn National Bank, Berwyn, Illinois, in the name of Luerana's Beauty Shop, which was used to deposit the receipts from petitioner's beauty parlor. The receipts so deposited in this account were not used by respondent in his determination of unreported income.

In 1947, Fannie May paid the petitioner the sum of $16,000 which was "payment in full of all charges and cost of every kind and nature and all services rendered." The petitioner executed a document dated March 18, 1947, covering the receipt of this sum.

During the year 1947, petitioner made deposits in her bank accounts as follows:

| | |
|---|---|
| Berwyn National Bank | $9,800 |
| First National Bank of Chicago | 11,700 |
| | 21,500 |

During this same year, petitioner received and reported on her income tax return the amount of $2,800 from her activities as a real estate broker.

During the year 1948, petitioner made deposits to her bank accounts in the following amounts:

| | |
|---|---|
| Berwyn National Bank | $5,000 |
| First National Bank of Chicago | 23,100 |
| Drexel National Bank | 8,000 |
| | 36,100 |

During this same year, petitioner received and reported on her income tax return the amount of $2,915 from her activities as a real estate broker.

During the year 1949, Fannie May cashed the following checks and gave the cash to petitioner:

$15,000
5,000
5,000
25,000

50,000

In this same year, petitioner deposited the following amounts in her bank accounts:

| | |
|---|---|
| Berwyn National Bank | $19,091.68 |
| First National Bank of Chicago | 7,800.00 |
| | 26,891.68 |

During 1949, petitioner received and reported on her income tax return the sum of $3,675 from her activities as a real estate broker.

During the year 1950, Fannie May cashed the following checks and turned over the cash to petitioner:

$5,000
50,000

55,000

During this same year, petitioner deposited the following amounts in her bank accounts:

| | |
|---|---|
| Berwyn National Bank | $53,850.48 |
| First National Bank of Chicago | 8,800.00 |
| | 62,650.48 |

In 1950, petitioner was instrumental in selling a building belonging to Fannie May. Petitioner received the sum of $1,500 as a commission on this sale and executed a receipt acknowledging the payment of this sum. The amount of this commission was not reported on petitioner's income tax return for 1950.

On her 1950 income tax return, petitioner reported gross receipts of $8,954.74 from the Luerana Beauty Shop, and claimed a total net loss of $2,813.44 from this operation. Petitioner also claimed a loss of $1,000 from the sale of stock. She received and reported the amount of $650 from dividends.

During the year 1951, Fannie May cashed the following checks and turned over the cash proceeds to petitioner:

$75, 000
10, 000
—————
85, 000

Petitioner deposited the following amounts in 1951 in her bank accounts:

Berwyn National Bank _____ $31, 232. 61
First National Bank of Chicago _____ 20, 200. 00
National Bank of McAlester _____ 5, 000. 00
Liberty National Bank & Trust Co _____ 16, 859. 43
—————
73, 292. 04

The deposit of $5,000 made in the National Bank of McAlester represents a transfer of funds from the Berwyn National Bank.

On her return for the year 1951, petitioner reported gross receipts from the operation of the beauty parlor in the amount of $15,882.27; from the sale of stock in the amount of $19,780.35; and from dividends of $2,570, for total gross receipts of $38,232.62, and claimed a net loss of $650.70. Respondent determined that petitioner received but did not report an additional $200 in dividends.

In the year 1951, petitioner purchased securities in the amount of at least $26,952.15. Of this amount, $8,208.54 was paid by check and the remainder came from an unidentified source.

During the year 1952, Fannie May cashed the following checks and gave the proceeds thereof to petitioner:

$17, 000
3, 000
—————
20, 000

Petitioner deposited the following sums to her bank accounts in 1952:

Berwyn National Bank _____ $22, 526. 52
Newport Harbor Bank _____ 10, 000. 00
—————
32, 526. 52

Of the amount deposited in the Berwyn National Bank in 1952, $3,312.83 represents the proceeds of the sale of certain stock, which sale was reported on petitioner's return.

On her return for the year 1952, petitioner claimed a loss of $1,000 from the sale of capital assets. No net income was reported. In addition to the unreported bank deposits, respondent determined that petitioner received but failed to report the sum of $810 in dividend income.

Petitioner was the only person who was authorized to write checks on the various bank accounts in her name during the period involved herein. She exercised complete control over the funds deposited. Fannie May was not authorized to draw checks on these accounts.

Petitioner, in addition to the above-listed bank accounts, maintained at least three safe-deposit boxes in various banks at different times during the years in issue. Some of the money turned over to petitioner by Fannie May was not deposited to her checking accounts but was placed in these safe-deposit boxes or kept in petitioner's home.

Petitioner wanted all moneys transferred to her by Fannie May to be in cash. Although Fannie May requested that petitioner give her a receipt for such cash, no receipts other than the two referred to above were given by petitioner to Fannie May. No one else was ever present when Fannie May gave these funds to petitioner.

Petitioner maintained no records of the sums of money received from Fannie May. The money received from Fannie May by petitioner and deposited in petitioner's bank accounts or placed in the safe-deposit boxes was under the complete control of petitioner. Petitioner used these funds to pay her personal rent, telephone, utility bills, and living expenses. She wrote a number of checks transferring money to members of her family; stocks were purchased by petitioner in her name and real estate was also purchased in her name from these funds. Petitioner made various political campaign contributions and purchased household appliances for her own use. In addition, petitioner purchased numerous automobiles which were used by her personally as well as by members of her family.

Petitioner's income tax returns for the calendar years 1947, 1948, 1949, and 1952 were prepared by Fred Adelmann, an accountant, who resides in Chicago. Petitioner's income tax returns for the calendar years 1950 and 1951 were prepared by Henry Melin, a certified public accountant of Chicago.

The returns for the years 1947, 1948, and 1949 were prepared solely from information given by petitioner to Adelmann. Petitioner did not give him any written documents but gave him the information orally and he did not make an audit. The return for the year 1952 was made from similar information except that, in addition, Adelmann

called her broker to secure the information regarding her brokerage transactions.

Adelmann commented to petitioner that there was very little income shown on the returns on which to live. Petitioner replied that if there was any other income, her attorneys would take care of it.

After the investigation in this case had been commenced by respondent, petitioner requested Vella Cochran to state that she had been present when Fannie May told petitioner that she (Fannie May) wanted to give all her money away so that her family would not get it. Vella denied having heard such a statement and informed petitioner that she was mistaken and must be confused.

Subsequent to the oral denial by Vella, petitioner attempted to secure an affidavit from her to the same effect. The affidavit was mailed to Vella and the accompanying letter is as follows:

519 North Hammond
Bethany, Oklahoma
*July 5, 1956*

Mrs. Vella Cochran
*5903 Northwest 50th*
*Oklahoma City, Oklahoma*

Dear Mrs. Cochran:

Enclosed is three affadavits that I spoke to you about the other day, and I hope you will sign them for me, as you are the one who knows most of the trouble I have had during this tax situation, and you and I were both present when Fannie May Scoville said these very words right in my home across the street from you. I am not asking any one to lie for me, I am only asking that the truth come forth to save my reputation. You can call my attorney and the affadavits are for the judge and the lawyers only they will not get into court nor in the news papers either, and they will save any one from coming to court, I have some signed, but I will have to ask the United States Treasury to subpena the ones that are afraid to sign them, for I am struggling to save my reputation with the truth only. When my friends were on the receiving end of this they didn't question where the money came from neither did they question my reputation, but the very people I helped most are the ones who hid when I ask that they merely tell the truth for me, and of course they will have to come to court to tell the truth for I will ask the United States Treasury to subpena them. The people I helped are the people I loved, and I believe you have sufficient religion in you to tell how I suffered with this tax situation and how embarrassed I was with the simple things Fannie May did in my home with her love for Owen Taylor. You are the one that saw me suffer so terrible over this money, for Mrs. Scoville is trying to say that she paid me a fabulous salary for being her detective, and if I was her detective some one would know it, some one would have known I was at work, and that is not true, I shall always appreciate how you stayed with me night after night, and how good you were to me, don't be frightened, for you can call Mr. John Griffin and talk with him about this affadavit. I am sure you won't say you don't know anything about this for that would not be true, and I don't believe you will lie about this. I am sending a copy of this letter to my attorney, one to the United States Treasury and I shall keep several copies in case they want to know to whom I have given the affadavits.

Sincerely,
/s/ Luerana Pigman
LUERANA PIGMAN

Petitioner indicated to other persons that she had been employed by Fannie May to handle her real estate transactions.

Prior to March 15, 1954, petitioner and respondent consented in writing to extend the period of limitations upon the assessment and collection of tax for the taxable year 1950 to June 30, 1955. Prior to the expiration of that consent period, the parties consented in writing to further extend the period until June 30, 1956. The statutory notice of deficiency for the year 1950 was issued on March 14, 1956.

Petitioner, in her income tax returns for each of the years in question, substantially understated income paid to her by Fannie May Scoville for the performance of personal services.

A part of the deficiency for each of the years involved was due to fraud on the part of petitioner with intent to evade tax within the meaning of section 293 (b), and each of petitioner's returns for the taxable years involved was false and fraudulent with intent to evade tax within the meaning of section 276 (a).

OPINION.

*Understatements of Income.*

Respondent determined that Luerana Pigman understated her income in the respective amounts of $18,700, $33,185, $23,216.68, $61,-400.48, $84,549.76, and $24,661.34 for the years 1947 to 1952, inclusive. This determination was based primarily on a bank deposit analysis, but also reflects certain specific items of unreported income.

On the basis of our discussion, *infra*, and subject to the adjustments specifically noted below with respect to the years 1951 and 1952, we hold that petitioner has failed to meet the burden of proof of error in respondent's determination. Accordingly, we sustain such determination in full for the years 1947 to 1950, inclusive.

With respect to the year 1951, respondent concedes by stipulation that the understated income as determined by him should be reduced by $5,000 which represents a transfer of funds from one bank account to another. Also, with respect to 1951, respondent's determination of unreported income includes an item of $26,952.15 as representing funds used to purchase securities which were not withdrawn from petitioner's bank accounts. We have reduced this item by $8,208.54, as shown in our Findings of Fact since the record establishes that this amount was paid to petitioner's broker by a check drawn on one of her bank accounts. As a result of these adjustments, the understatement of income for 1951 is reduced to $71,341.22.

With respect to 1952, it is stipulated that the understatement of income determined by respondent should be reduced by $3,312.83, which represents proceeds from the sale of capital assets which were

accounted for by petitioner for that year. Accordingly, respondent's determination of unreported income for 1952 is reduced to $21,348.51.

Respondent maintains that the bulk of the unreported amounts represents moneys paid to petitioner by Fannie May Scoville for services rendered. The unreported dividends and commission have not been contested and we will hereafter be concerned only with the funds received by petitioner from Fannie May.

Petitioner admits receiving substantial sums of cash from Fannie May but denies that such funds represent taxable income. Luerana alleges that such sums were in the nature of trust funds to be used for charitable purposes.

In her petition she states:

(a) All of the unidentified bank deposits and other items erroneously classified as taxable income were received by the taxpayer or resulted from transfers to the taxpayer from one Fannie May Scoville of Chicago, the same to be held in trust for the benefit of unnamed individuals and organizations who were the objects of Mrs. Scoville's charity and benevolence. The donor wished to remain anonymous in her many acts of generosity and asked the taxpayer to perform these commendable services, without compensation. * * *

In her reply to respondent's amended answer, petitioner further stated her position as follows:

The unidentified bank deposits and other items classified by the Commissioner as taxable income were the property of another party and transferred to the Petitioner to be held in trust and to be distributed to such individuals and organizations as the owner designated. The Petitioner performed these services as Trustee and without compensation.

Thus, the fundamental question to be resolved is whether the funds admittedly received by petitioner from Fannie May were for services rendered, or whether they were to be held in trust and disbursed as directed to needy persons or groups who were the objects of Fannie May's benevolence.

The primary issues presented to us are factual, and the question of creditability is of paramount significance. The evidence in the record points to the conclusion that, in the main, there are only two persons who are in a position to know the actual facts with regard to the purposes for which these large sums of money were given to petitioner, namely, Fannie May Scoville and Luerana Pigman. There was no one else present when the payments were made and no written records to refer to, with the exception of the receipt for $16,000 signed by petitioner in 1947, which she disputes.

Upon consideration of the entire record and for the reasons hereinafter stated, we are convinced that petitioner, during the years 1947 to 1952, inclusive, substantially understated her income.

The overall story as presented in the record reads like a paperback mystery novel (except that there is no butler upon whom our sus-

picions may be cast). The two principals, Fannie May and Luerana, have presented completely opposite stories, even to the extent of differing on the methods which Luerana used to tell fortunes in the massage parlor.

For example, Luerana testified that when she first met Fannie May she was led to believe that she was a very poor person who was in desperate straits. Fannie May's appearance, the shabbiness of her clothes and effects, as well as her attitude, engendered this feeling. With this in mind, Luerana stated, she purchased a small radio, on her meager salary, to give Fannie May for a Christmas present. That night Fannie May came to her house and she gave her the radio. Petitioner testified in part as follows:

I had bought her a little radio for Christmas because I thought she was a poor person. She told me she lived in a one-room and didn't eat right, and I thought she was a very poor person, and I tried to cook nice things for her, so that day she invited me to go to Heidelberg with her and she said, "I have brought you a Christmas present." I had bought her a little radio, was paying for it on time to give to her for Christmas. I did not know she was a millionaire, and she said she had brought me something to sort of repay me for her deception to me, for me to look outside, and I saw a big black Cadillac and a chauffeur and she said, "I am going to tell you who I am," so she said she was born a Vanderbilt, but her name was Grocious, and she gave me an envelope.

She said, "You can look in it," and she cried because I had bought her this little radio and she knew how poor I was, and when I looked in the envelope there were ten one thousand dollar bills in it, and I almost fainted.

    *       *       *       *       *       *       *

I told her that she had taken that money, she and that chauffeur, maybe that they had perhaps taken it and they could not do that to me, I wouldn't accept that money, and she laughed and told me how honest I was, and I was very frightened and really it made me ill, I had never seen a thousand dollar bill, and I went downstairs to the people—I lived in a little attic flat there and I went downstairs to the people and told them about this money, and I called the Inglewood police and I called Officer Crawley, who was on robbery detail, and I told him what had happened and that she had invited me to Heidelberg.

He told me to go with her and they would follow me * * *

Petitioner then testified that the police did follow her but did not comment on what happened other than to say that all the employees of the restaurant bowed to her. She also testified that she later returned the $10,000.

No corroborative evidence of any kind was introduced by petitioner to support the above narrative, and suffice it to say that Fannie May categorically denied the truth thereof.

The above testimony is only illustrative of the conflicting stories as presented by this record.

Aside from the conflict in testimony between petitioner and Fannie May, other evidence contradicts petitioner's story. The major conflict arises over the degree of control exercised by petitioner over the

funds in her possession and in her bank accounts, assuming, *arguendo*, that they were trust funds and not income to petitioner.

Petitioner testified that Fannie May authorized the issuance of each check in her (Luerana's) account. Fannie May allegedly always told petitioner what to do with the money and that petitioner never requested a dime for herself.

We accept the testimony of the special agent who conducted the investigation of petitioner's income tax returns to the effect that petitioner, in the presence of her former attorney, stated that Fannie May turned the funds over to her and relied entirely on her integrity and ability to recognize needy persons who were deserving and who warranted having those funds distributed to them.

Our conclusion in this respect is supported further by other evidence. Petitioner, as noted above, testified that she received Fannie May's authority before she wrote each check. She testified, for example, that certain checks were written to J. D. McCarty for insurance premiums on her home and for a substantial investment in a corporation she was forming to deal in oil and gas leases. Petitioner's use of "we" regarding the issuance of these checks leaves no doubt that she was implying that Fannie May authorized the issuance of the checks to McCarty.

J. D. McCarty was called as a witness by the respondent and testified that he had never received any gifts from petitioner. He stated that moneys were given to him for investment purposes and for insurance premiums. The Court inquired of Mr. McCarty as to whether he had any personal contacts with Fannie May. He replied that he met her only once at petitioner's home. He denied ever having any business or personal contacts with Fannie May and, as far as he knew, never received any gifts from her.

One thing is clear—the checks to McCarty were not for charitable purposes. That is, charity to McCarty. It strains our credulity to believe that Fannie May authorized the issuance of these checks to McCarty. Even if she had knowledge of their issuance, which does not find any support in the record except for the testimony of Luerana, it is also clear that McCarty was not an object of Fannie May's charitable benevolence.

Petitioner's own testimony regarding a trip to California that she had undertaken at Fannie May's behest to speak with her stepson is self-contradictory. On direct examination, she stated that it was the stepson who was going to sue Fannie May. On cross-examination, she stated that it was Fannie May who was going to sue her stepson. She added that the stepson was not giving Fannie May any trouble at all. She then stated that she didn't know whether Fannie May was having any difficulty with her stepson. She did state, however, that Fannie May told her that she was having difficulty with her stepson.

In her testimony, petitioner attempted to paint herself as an uneducated, unfortunate individual who was completely at a loss in the hazardous world of business. On direct examination, she stated that, "I did not complete the eighth grade." In response to her counsel's question as to whether she looked at or inspected her income tax returns before they were filed, she stated, "I wouldn't know what they were if I saw them. I wouldn't understand them." When asked further by her counsel to identify certain bank ledger statements, she stated, "I don't know that I ever seen a ledger sheet so I don't—I imagine it is."

On cross-examination, respondent introduced into evidence a certified copy of petitioner's employment records in the custody of the Department of the Army. This record shows that petitioner, in applying for a Government position, stated that she had attended 2 high schools in the Chicago area, completing 1 year (1937–1938) at one and began another in 1938, and was still attending same in February 1942. Her previous employment record, as stated in this application, was extensive and indicated that she owned 11 hamburger stands which grossed $1,000 a month; managed restaurants; and was a cashier at others.

When respondent's counsel questioned petitioner on her educational background, in light of her employment application, she was evasive. It was established, and we have so found, that petitioner received more formal education than she had indicated in her previous answer, "I did not complete the eighth grade." Her statement that she would not recognize a bank ledger statement is beyond belief in view of the fact that she maintained at least six bank accounts during the period in issue and was undoubtedly receiving monthly or quarterly ledger statements from these banks. Her professed ignorance of anything concerning business or tax returns is likewise questionable in light of her experience as the owner and operator of a number of hamburger stands, manager of restaurants, cashier, real estate saleswoman, investor in real estate and stocks, and partner in an employment agency.

Petitioner maintains that these sums were transferred to her to be held in trust for the benefit of unnamed individuals and organizations who were the objects of Fannie May's benevolence. No corroborative evidence has been introduced to support this contention. Not one of the alleged needy persons or organizations was identified. Not one was produced in court.

A careful analysis of the evidence discloses that the bulk of the funds, where identifiable, was used to benefit Luerana and her family. It is obvious from the schedule of canceled checks that petitioner's rent, utilities, and all personal expenses were paid from

these funds. Her scale of living was far above mere subsistence. During the period she resided in and around Chicago she had at her disposal and in her name 4 Chrysler and 3 or 4 Cadillac automobiles. Her brothers also had new automobiles purchased from these funds. Electric appliances were purchased. Petitioner appeared to dress well. She invested substantial sums in real estate and stock during this period. This situation might well be said to illustrate the old adage, "charity begins at home."

From the above discussion, it is readily apparent that we do not accept petitioner's story that these sums were in the nature of trust funds to be used for the charitable desires of Fannie May.

The testimony of a number of witnesses was taken by deposition, and we did not have the opportunity to observe them personally. Chief among these was Fannie May Scoville. Her testimony indicated antipathy toward petitioner and could not be taken as altogether objective or detached. On the other hand, taken together with other facts in the record, we have no doubt that her testimony was substantially true.

In view of the unusual testimony of both petitioner and Fannie May, we have searched the record diligently, seeking to determine the amounts, if any, given to petitioner that were not compensatory in nature. The only direct evidence of a gift to petitioner from Fannie May occurs in Fannie May's own testimony. She stated that she gave petitioner $500 as a gift to cover some of Luerana's medical expenses. The year was not established. Therefore, we have no basis for making any allowance to petitioner for this admitted gift.

There are two other factors in the record to which our attention has been drawn in this connection. We know that Fannie May, by her own admission, made gifts of money and property to various other persons during the years in question. Assuming that this indicates a proclivity on the part of Fannie May to make gifts, it fails to establish that she made any gifts, other than the aforementioned $500, to petitioner.

Fannie May testified that she paid petitioner $16,000 in 1947, which is evidenced by the receipt referred to above. Photostatic copies of canceled checks drawn by Fannie May and made payable to cash were introduced into evidence by respondent. Fannie May testified that the proceeds from these checks were given to petitioner. There were no checks dated in the years 1947 and 1948. Fannie May could not remember paying petitioner any funds in 1948 and relied solely on the canceled checks to establish the payments. She did not, however, deny that she may have made payments to petitioner in 1948.

With the exception of the year 1952, all the payments as evidenced by these canceled checks exceeded the amounts deposited by petitioner

in her bank accounts, said accounts serving as the basis of respondent's determination of unreported income. We have found as a fact that petitioner maintained several safe-deposit boxes wherein she kept cash. We have no means of knowing whether the difference between the payments and the bank deposits was placed in these safe-deposit boxes or kept in petitioner's home.

The record affords no basis upon which to allow petitioner any unclaimed business expenses arising from the personal services performed for Fannie May.

Petitioner, on brief, raises two additional (alternative) arguments. One is that some part of the funds transferred by Fannie May to petitioner "may" constitute a "series of gifts" to petitioner. The other is that in the event it be determined that the funds were expended without the proper authority of Fannie May or were used for purposes other than that for which they were transferred, such disposition would constitute an unauthorized conversion of the funds by petitioner to her own use, but would not make those funds taxable to her. Petitioner rests this argument on the authority of *Commissioner* v. *Wilcox*, 327 U. S. 404 (1946), and *McKnight* v. *Commissioner*, 127 F. 2d 572 (C. A. 5, 1942).

Respondent, on brief, argues that these contentions are entirely foreign to the allegations of error and facts set forth in the pleadings and hence should be disregarded, since no motion to amend the pleadings has been made by petitioner. *Western Wheeled Scraper Co.*, 14 B. T. A. 496 (1928); *Merton E. Farr*, 11 T. C. 552 (1948), affirmed sub nom. *Sloane* v. *Commissioner*, 188 F. 2d 254 (C. A. 6, 1951).

We need not decide this procedural point. As to the first alternative contention, the record does not support the conclusion that the payments, or any substantial part thereof, were gifts. The second alternative contention is grounded on the premise that the funds transferred by Fannie May Scoville to petitioner were encumbered with a trust or duty to be discharged by petitioner, and, in effect, that any appropriation of such funds for her own use amounted to embezzlement. Again we cannot agree either upon the facts or the legal inference urged. Suffice it to say that we hold that the funds transferred by Fannie May to petitioner were paid for services at least claimed to have been rendered by the latter to the former, even though such claimed services were vague, not to say fantastic. In any event, petitioner has failed to prove by acceptable testimony that the payments were other than compensatory.

Upon the basis of the foregoing discussion, we sustain respondent's determinations except for the adjustments specifically referred to with respect to 1951 and 1952, as to which computations will be made under Rule 50.

*Fraud.*

We next consider the question of whether or not a part of the deficiency for each of the years 1947 to 1952, inclusive, was due to fraud with intent to evade tax within the meaning of section 293 (b) of the Code of 1939. The burden of proof with respect to fraud is upon the respondent, and he must establish fraud on the part of petitioner by clear and convincing evidence. *Arlette Coat Co.*, 14 T. C. 751 (1950).

It should be noted at the outset that our conclusion in these respects must be based upon consideration of the entire record properly before us, and that we are not limited to a consideration of respondent's affirmative evidence. *Frank Imburgia*, 22 T. C. 1002 (1954) ; *Wallace H. Petit*, 10 T. C. 1253 (1948) ; *L. Schepp Co.*, 25 B. T. A. 419 (1932). We also recognize that in this, as in many fraud cases, the proof of fraud, if it is to be established, must depend in some aspects upon circumstantial evidence. Fraudulent intent can seldom be established by a single act or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all the evidence of record and inferences properly to be drawn therefrom. *M. Rea Gano*, 19 B. T. A. 518 (1930).

Our finding of an understatement of taxable income for each of the years for the purposes of the deficiencies involved was based in some respects upon petitioner's failure to meet her burden of proof. We recognize that respondent cannot meet his own burden of establishing fraud on the basis of petitioner's failure to discharge the burden of proving error in the determination of deficiencies, and we do not, of course, rest our finding of fraud on that basis. The existence of fraud with intent to evade tax must be affirmatively established by respondent. *Kurnick* v. *Commissioner*, 232 F. 2d 678 (C. A. 6, 1956) ; *Drieborg* v. *Commissioner*, 225 F. 2d 216 (C. A. 6, 1955), affirming in part a Memorandum Opinion of this Court dated February 24, 1954.

After a painstaking analysis of all of the evidence in this case, and bearing in mind the above-stated principles, we are convinced that petitioner received taxable income during each of the years 1947, 1948, 1949, 1950, 1951, and 1952 from the performance of personal services in excess of that reported on her returns for those years, and that in each of said years a part of the deficiency was due to fraud with intent to evade taxes. It is well settled that respondent, in sustaining his burden of proof of fraud, need not prove the precise amount of each deficiency attributable to such fraud, but only that a part of such deficiency is attributable thereto. *United States* v. *Chapman*, 168 F. 2d 997 (C. A. 7, 1948), certiorari denied 335 U. S. 853 (1948).

During the years in question, petitioner understated her income by approximately a quarter of a million dollars. It has long been established that continued understatement of large amounts of taxable income is evidence of a fraudulent intent to evade tax. As we said in *Albert N. Shahadi*, 29 T. C. 1157, 1169 (1958), on appeal to C. A. 3, "It is well settled that such large unexplained discrepancies between actual net income and reported income over a number of years are evidence of fraud." See also the case of *W. A. Shaw*, 27 T. C. 561 (1956), affd. 252 F. 2d 681 (C. A. 6, 1958), in which this Court stated, at page 573:

The consistent understatement of substantial amounts of income is persuasive evidence of fraud. *United States* v. *Calderon*, 348 U. S. 160 (1954); *Rogers* v. *Commissioner*, 111 F. 2d 987 (C. A. 6, 1940); *Arlette Coat Co.*, 14 T. C. 751 (1950). * * *

In *Anderson* v. *Commissioner*, 250 F. 2d 242 (C. A. 5, 1957), certiorari denied 356 U. S. 950 (1958), affirming T. C. Memo. 1956–178 on all issues here significant, the Court of Appeals, in discussing consistent understatement of substantial amounts of income, said in part (p. 249):

Of course the courts have repeatedly held that the mere omission of reportable income is not of itself sufficient to warrant a finding of fraud in an income tax case. *Bryan* v. *Commissioner of Internal Revenue*, 5 Cir., 209 F. 2d 822; *Goldberg* v. *Commissioner of Internal Revenue*, 5 Cir., 239 F. 2d 316, 320. However, repeated understatements in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income present a basis on which the Tax Court may properly infer fraud. The attitude and testimony of the taxpayer as a witness at the trial may, of course, be considered by the court in determining how much weight is to be given to his testimony. * * *

Although petitioner maintained business records reflecting the operations of her beauty parlor, she did not keep any records of the sums received from Fannie May. The transactions between petitioner and Fannie May were conducted wholly in cash and only one receipt was given by petitioner to Fannie May during the years in question covering the services performed for Fannie May.

During the years when Fred Adelmann prepared her returns, petitioner orally supplied him with the data necessary to prepare said returns. Petitioner was aware of the possibility that she had more income than was being reported on her returns. When Adelmann pointed out to her that she was reporting very little income on which to live, she told him that if there was any other income, her attorneys would take care of it. The record is silent on whether or not petitioner was advised by any person, competent or otherwise, that the funds received by her from Fannie May, were not income. We infer from this silence that no such advice was given petitioner.

During the pendency of respondent's investigation of petitioner's income tax returns, Luerana orally requested her neighbor, Vella

Cochran, to make a statement regarding a conversation alleged to have taken place in her presence. The gist of the statement sought by petitioner was that Vella heard Fannie May Scoville say that she wanted to give all of her money away so that her family would not receive any of it. Vella Cochran told petitioner that she would not make such a statement because she had never heard Fannie May utter those words and that petitioner must be confused. Petitioner did not orally request Vella Cochran to make an affidavit but later mailed a draft of affidavit to her which went beyond the scope of the original request and included items such as that the affiant heard Fannie May say that she did not employ the petitioner and that the moneys given to petitioner were to be used for Fannie May's charities. This affidavit was accompanied by a letter which is set forth in our Findings of Fact. The affidavit was never executed by Vella.

We do not mean to imply that a party to litigation in this Court may not, without having suspicion of an evil motive drawn against him, request supporting affidavits from those who know the facts, or use the subpoena process to compel the appearance of a reluctant witness. Here, however, it must be borne in mind that Vella specifically informed petitioner that she could not make the requested statement because she had never heard Fannie May say what petitioner claimed. Vella told petitioner that the latter must be confused. Despite this, petitioner's letter transmitting the affidavit to Vella discloses a clear intent to exert pressure on Vella to swear to facts, the existence of which Vella had in effect denied.

We had the opportunity to observe Vella when she appeared at the trial. In our opinion she was an honest and forthright person whose testimony was truthful. We cannot view petitioner's conduct as other than an effort to persuade Vella to make false statements.

We, of course, also had the opportunity to observe petitioner on the witness stand, and we have carefully analyzed her testimony. We are satisfied that she is unworthy of belief. In *Anderson* v. *Commissioner*, *supra*, the court said, in part (p. 247) :

One of the important functions of the Tax Court, as trier of the facts, is to pass on the credibility of the taxpayer as his own witness. The Court is not required to accept as true every statement made by the taxpayer even if uncontradicted. If testimony is inherently so implausible or improbable as to stretch the credulity of the Court it can decline to believe it if the taxpayer's credibility is already before the Court. * * *

Upon the basis of the foregoing discussion, we hold that a part of the deficiency for each of the years involved was due to fraud with intent to evade taxes, and we, therefore, hold that additions to tax under section 293 (b) for each of said years are to be applied, subject to recomputation under Rule 50, for the years 1951 and 1952, because of our determination reducing unreported income for these years.

Upon the same facts as those on which we base our determination that some part of each of the deficiencies in this case was due to fraud with intent to evade tax, we find that each of petitioner's returns for the years in question was false and fraudulent with intent to evade taxes within the meaning of section 276 (a). Accordingly, the statute of limitations is not applicable to any of the deficiencies in issue.

*Addition to Tax under Section 294 (d) (1) (A) and (d) (2).*

For each of the years in question, respondent has determined additions to tax under section 294 (d) (1) (A) and 294 (d) (2) for failure to file declarations of estimated tax and for substantial underestimation of the estimated tax. There has been no satisfactory showing that petitioner's failure to file said declarations was due to reasonable cause and petitioner is liable for the additions to tax under section 294 (d) (1) (A). Since no declarations of estimated tax were filed, petitioner substantially underestimated the estimated tax and is, therefore, liable for the additions to tax asserted under section 294 (d) (2). We sustain respondent, therefore, with respect to the additions to tax in question (subject to recomputation under Rule 50 with respect to 1951 and 1952 in the light of our determinations reducing the understatements of income in those years). As to the application of additions to tax under both 294 (d) (1) (A) and 294 (d) (2), see *Patchen* v. *Commissioner*, 258 F. 2d 544 (C. A. 5, 1958), affirming in part 27 T. C. 592 (1956); *Abbott* v. *Commissioner*, 258 F. 2d 537 (C. A. 3, 1958), affirming 28 T. C. 795; *Hansen* v. *Commissioner*, 258 F. 2d 585 (C. A. 9, 1958), affirming in part and reversing in part T. C. Memo. 1957–113; *G. E. Fuller*, 20 T. C. 308 (1953), affirmed on other grounds 213 F. 2d 102 (C. A. 10, 1954). But cf. *Acker* v. *Commissioner*, 258 F. 2d 568 (C. A. 6, 1958), reversing T. C. Memo. 1957–17.

*Decision will be entered under Rule 50.*