William G. Bonelli and Mary P. Bonelli v. Commissioner.
Bonelli v. Commissioner
Docket No. 75979
United States Tax Court
T.C. Memo 1965-26; 1965 Tax Ct. Memo LEXIS 304; 24 T.C.M. (CCH) 122; T.C.M. (RIA) 65026; February 12, 1965
Bruce I. Hochman and Justin L. Goldner, for the petitioners. Thomas J. Sullivan, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax for the years and in the amounts as follows: Additions to the tax
Sec. 293(b)
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
Year
Deficiency
I.R.C. 1939
I.R.C. 1939
I.R.C. 1939
1952
$43,869.06
$21,934.53
$4,622.98
$3,081.99
1953
17,487.26
8,743.63
1,582.31
1,054.88
By amendment to answer respondent claimed an increased deficiency *305 in income tax for the year 1953 of $6,903.14 and increased additions to tax for this year under sections 293(b) and 294(d) of the Internal Revenue Code of 1939 in the amounts of $3,451.57 and $1,035.48, respectively. At the trial respondent conceded that petitioners are not liable for the additions to tax under section 294(d)(2) of the Internal Revenue Code of 1939. [1]
The issues for decision are: (1) Whether the returns filed by petitioners for each of the years 1952 and 1953 are false and fraudulent with intent to evade tax, so that the deficiencies determined by respondent are not barred by the statute of limitations. (2) If it is determined that the returns are not false or fraudulent, did petitioners omit from gross income amounts in excess of 25 percent of the amounts of gross income as shown on their return for each of the years 1952 and 1953 so that the 5-year statute of limitations provided for in section 275(c) is applicable. (3) Whether petitioners received income from payments made by applicants for liquor licenses during the years 1952 and 1953 which they did not report *306 on their income tax returns filed for those years, and if so whether any part of the deficiency resulting therefrom is due to fraud with intent to evade tax. (4) Whether respondent properly determined additions to tax under the provisions of section 294(d)(1)(A). Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife who resided during the years here involved in Saugus, California, filed joint Federal income tax returns with the district director of internal revenue at Los Angeles, California for the calendar years 1952 and 1953. The return for the year 1952 was filed on May 29, 1953, pursuant to an extension of time for filing such return previously granted, and the return for the year 1953 was filed by petitioners on June 15, 1954, pursuant to an extension of time for filing such return previously granted. William G. Bonelli, hereinafter referred to as petitioner, during the years 1952 and 1953 was an elected member of the Board of Equalization for the State of California. He was elected from and represented the Fourth Equalization District which encompassed the eight southern California counties of Santa Barbara, *307 Ventura, Los Angeles, San Bernardino, Riverside, Orange, San Diego, and Imperial. Petitioner had been a member of the Board of Equalization since 1938. During the years 1952 and 1953, the Board of Equalization of the State of California consisted of four members. This board had the exclusive power under the then existing law to issue on-sale liquor licenses in the State of California. The jurisdiction of the Board of Equalization governed the collection of sales and use taxes, gasoline taxes, truck taxes, alcoholic beverage taxes, the annual valuation of all public utilities in the State of California, and the equalization of property taxes among the 58 counties in the State of California. This board also functioned as an appeal board for the franchise and inheritance tax appeals and was constitutionally empowered to administer the provisions of the California Alcoholic Beverage Act. In the exercise of all of its jurisdiction, action could be taken only by board order arrived at in a regularly called meeting of the Board of Equalization with a valid quorum present, and by a majority vote. If an elected member of any district was not present for a meeting or a roll call, the board *308 could, and would, act on all matters in all districts and the action was binding upon the absentee. While the State Constitution invested the Board of Equalization with jurisdiction over the subject of the liquor law administration, the California legislature was responsible for passing an enabling act under which the board functioned. This law was known as the California Alcoholic Beverage Act and is set forth and recited in full as Division 9 of the Business and Professional Code of the State of California. Under the terms of the California Alcoholic Beverage Act, there was created a State Liquor Administrator who was responsible to the Board of Equalization through its secretary. The State was divided into 13 administrative districts, 4 of which were in the Fourth Equalization District. Over each of such 13 administrative districts was a civil service employee known as the District Liquor Control Chief. Each District Liquor Control Chief had working for him Supervising Liquor Control Officers who were responsible for most of the field work and investigations. Hearing Officers were available to hear complaints, find facts, and make recommendations in disputed or contested cases. *309 Under the law of California, as it existed in 1952 and 1953, on-sale liquor licenses were apportioned one to each 1,000 population as determined by the official decennial census of the United States. Seasonal on sale liquor licenses could be issued at the discretion of the board. Petitioner was an incumbent officeholder during the calendar years 1952 and 1953 and did not run for political office during either of those years. In 1954 petitioner ran for reelection as a member of the Board of Equalization but was defeated. For the calendar year 1952 petitioners reported on their income tax return wages of $14,000 from the State of California and net income of $16,422.95 from other sources which was arrived at by deducting from total receipts from business or profession of $46,515.30 costs of goods sold and expenses totaling $30,092.35. The total receipts from business or profession reported consisting of the following: Dividends
$ 1.00
Rents, royalties
13,491.60
Miscellaneous, tax and interest re-
funds, AAA payment, cattle
sales, etc.
39,435.28
Bell Oil (Bonelli) Joint Adventure-
Loss
(6,412.58)
$46,515.30
On their income tax return for the calendar *310 year 1953 petitioners reported total wages from the State of California of $14,000.06 and a business loss of $2,585.86, which was arrived at by deducting from total receipts from business or profession of $36,614.79 costs of goods sold and expenses totaling $39,200.65. The total receipts from business or profession reported consisted of the following: Dividends
$ 569.00
Rents and royalties
12,418.53
Miscellaneous, tax and interest re-
funds, Government bonds inter-
est, etc.
43,534.84
Bell Oil - Loss
(15,461.04)
Vandenbark-McGuire Oil - Loss
(4,446.54)
$36,614.79
During the years 1952 and 1953 Harold E. MacKenzie, hereinafter referred to as MacKenzie, was employed by the Board of Equalization for the State of California as District Liquor Control Supervisor. In that capacity MacKenzie had jurisdiction over the counties of San Bernardino, Riverside, and Orange located within the Fourth Equalization District. MacKenzie as District Liquor Control Supervisor had civil service status under the State of California's Civil Service system. During the years 1952 and 1953 the following applicants for liquor licenses turned over to Elsie Jones, sometimes referred *311 to as Mickey Jones and hereinafter referred to as Mickey, cash in the amounts indicated on the dates indicated: Applicant
Cash
Date
Dewey Metzdorf
$8,000.00
November 1952
George Strebe
2,000.00
November 1952
Ross Gray
8,000.00
December 1952
Ray Collins
3,000.00
December 13, 1952
Raymond Trevorrow
7,500.00
December 21, 1952
Wade Taylor
4,000.00
December 2, 1952
Harriette Hurt
5,000.00
January 1953
Ralph Gragg
4,200.00
Early part of 1953
Ted Gleichman
5,600.00
Early part of 1953
During the year 1953 an applicant for a liquor license, Paul Thetford, turned over cash to Edward Seeman in the amount of $4,000. Sometime in March 1953, an applicant for a liquor license, Yoland Markson, turned over cash in the amount of $8,000 to Santos de Jesus who delivered the cash to Edward Seeman. The money received by Mickey from the various applicants for liquor licenses was delivered by her shortly after its receipt to MacKenzie, and the money receipt to MacKenzie, and the money received by Seeman from Paul Thetford was delivered to MacKenzie. The $8,000 which had been delivered to Seeman on behalf of Yoland Markson was turned over by either Mickey *312 or Seeman to MacKenzie. On May 13, 1955, MacKenzie was convicted by the Superior Court for Orange County, California of a felony, under the provisions of section 182 of the Penal Code of the State of California, which is entitled "Conspiracy To Commit The Crime Of Asking Or Receiving Bribes By Public Officers." On this same date MacKenzie was convicted by the same Court of two counts of a felony under the provisions of section 68 of the Penal Code of the State of California entitled "Asking Or Receiving Bribes By Public Officers Or Employees." On December 23, 1955, MacKenzie was convicted by the Superior Court of Riverside County of a felony, under the provisions of section 182 of the Penal Code of the State of California which is entitled "Conspiracy To Commit The Crime Of Asking Or Receiving Bribes By Public Officers." During each of these trials MacKenzie testified under oath and denied that he ever received any of the funds turned over to Mickey or Seeman. MacKenzie testified before the grand jury of San Diego County, California in April 1955. At that time he stated under oath that he had not asked anyone to collect money on behalf of William G. Bonelli and that he did not *313 collect any funds from a liquor licensee for the use of Bonelli in his campaign for reelection. On September 28, 1956, MacKenzie was incarcerated for the above crimes at the Los Padres State Prison at San Luis Obispo, California. On or about August 31, 1953, a burglary at the home of MacKenzie was reported to the San Bernardino Police Department. A day or two following that report MacKenzie told the captain of that police department that there was money in the safe that didn't belong to him that he would like to have recovered. MacKenzie stated that there was an envelope in the safe which had $20,000 in currency in it. MacKenzie did not discuss with the captain of the San Bernardino Police Department the putting out of a story that a greater amount of money was taken than the amount actually in the safe. During the years 1951 and 1952 Internal Revenue Agent Leslie Clark had assigned to him for investigation petitioners' income tax returns for the years 1946 through 1950. The investigation was conducted by this Revenue Agent as a joint investigation with a special agent of the Intelligence Division of the Internal Revenue Service. Both the revenue agent and the special agent continued *314 their work on this investigation over a period of approximately 2 years but did not devote their full time to such investigation. During this same 2-year period these two agents were also investigating certain income tax returns of corporations owned by petitioners. Petitioner was aware of these investigations and furnished the agents with bank records and other records requested by them. Petitioner was questioned about the income reported by him on his returns for these years and particularly about amounts reported as miscellaneous income. A portion of the miscellaneous income reported in each of these years consisted of gambling income, including in one year World Series winnings and in another year gin rummy winnings, the amount of such gambling income ranging from $10,000 to $40,000 per year. Petitioner had records which he showed to the agents of his winnings at the race tracks. These records consisted of the programs of the days that he attended the races and uncashed tickets on which he did not win. Petitioner had circled on the program the name of the horse on which he won and made a notation of the amount of money he had won, and in some instances he had a sheet from the *315 newspaper showing what the horse had paid. The agents who had investigated petitioner's returns for the years 1946 through 1950 did not remember what percentage of the miscellaneous income reported consisted of gambling income. The result of this examination over the 5-year period was a determination of deficiencies in petitioners' income taxes for some years and of overassessment for other years. No court action resulted from the investigation. During 1956, the investigation of petitioners' income tax returns for the years 1952 and 1953 was assigned to Internal Revenue Agent Gordon Keller and Special Agent Marvin Ness. After being assigned to the investigation Special Agent Ness attempted to contact petitioner but was unable to reach him. Petitioner's son informed the special agent that petitioner was in Mexico. At that time indictments were outstanding against petitioner charging him with the violation of the laws of the State of California dealing with bribery or conspiracy to solicit bribes. On May 2, 1957, Special Agent Ness called on MacKenzie at the Los Padres State Prison at San Luis Obispo, California. Ness had a reporter with him at the time and questioned MacKenzie *316 with respect to his relationship with petitioner. The questions and answers were under oath and were transcribed by the reporter who accompanied Ness. On May 28, 1957, Ness again visited MacKenzie at the State prison. During this period another special agent in the Internal Revenue Service had MacKenzie's income tax returns under investigation. In July 1957 Keller and Ness called on petitioner's son who was then living in petitioner's home in Saugus, California. At that meeting petitioner's son stated to the internal revenue agent and special agent that he was handling his father's affairs and would be prepared to do whatever was necessary to supply the information requested by the agents. He produced several manila folders, stating that they were his father's records supporting his income tax return for the year 1952. Petitioner's son did not produce the records for the year 1953. The agents proceeded to verify information shown on petitioner's 1952 income tax return by way of having petitioner's son consult his father's records and give oral information as to the nature of the items on the return. During the course of the investigation the agents copied certain information from *317 the records in the manila folder which they were able to see from where they were sitting across the table from petitioner's son and made certain notations of statements made by petitioner's son as he consulted his father's records. The following information was taken down at this conference by the revenue agent 7/23/57
Wm. G. Bonelli
Analysis of Misc. Income
T. P.'s Records
Total
'52
'53
'54
11/22/52
Las Vegas
$ 6,600.00
11/25/52
Las Vegas ($5000.00 dep.)
13,100.00
2/9
Loss - Las Vegas-El Rancho Vegas
(9,500.00)
2/11
Las Vegas Vegas-El Rancho Vegas
3,000.00
3/1
Las Vegas Vegas-El Rancho Vegas
(5,000.00)
3/1
Las Vegas Vegas-El Rancho Vegas
1,000.00
3/1
Las Vegas El Rancho Vegas
$1,000.00
3/1
Las Vegas El Rancho Vegas
3,000.00
3/1
Las Vegas El Rancho Vegas
(1,000.00)
3/1
Las Vegas El Rancho Vegas
(2,500.00)
3/1
Las Vegas El Rancho Vegas
(1,000.00)
3/1
Las Vegas El Rancho Vegas
(2,000.00)
4/29
Las Vegas El Rancho Vegas
1,250.00
4/29
Las Vegas El Rancho Vegas
250.00
5/1
Las Vegas El Rancho Vegas
($13,500.00)
(2,000.00)
8/10
Las Vegas El Rancho Vegas
3,000.00
8/11
Las Vegas El Rancho Vegas
3,000.00
8/15
Las Vegas El Rancho Vegas
(7,500.00)
10/16 Paid
7,500.00
11/22
6,600.00
11/25
13,100.00
19,700.00
7,5
$13,200.00
$13,500.00
Deposit
15,702.00
Cash purchase
10,000.00
Loan paid
39,202.00
3,928.50
43,130.50
7-23-57
*318 Wm. G. Bonelli
Currency Deposits - Personal A/C's
Bk. of Am.
Newhall Br.
Main Office
90-988
16-5
11/29/52
$ 5,000.00
LV-ELV
DI
SAH
10/14/52
4,500.00
LV
9/7/52
DI
1,500.00
11/22
Interbranch
$2,500.00
10/16
1,500.00
3/15
DI 3/11/52
2,500.00
LV won
$13,500.00
$4,000.00
LV = Las Vegas
DI = Desert Inn (?)
SAH = Sahara (?)
ELV = El Rancho Vegas (?)
Wm. G. Bonelli
Misc. Income - per 1040
1951
1952
1953
1954
$15,033.17
$39,435.28
$43,534.84
0
AAA B/A Fillmore
$ 1,304.78
11/18 - Sale of Cattle - drawn on
90-592-dba
a/c (1/2 X 350)
175.00
4/9 - AAA
11-37
467.51
662.27
Fed. Reserve
The document consisted of three pages, a new page beginning with each new caption as set forth in the schedule as reproduced herein. The figures on the first page by which dates and the notation "Las Vegas" appear were copied from records which were stated to the agents to be records of petitioner's gambling winnings and losses during the year 1952 in Las Vegas, Nevada. The figures in parentheses represented losses and the other figures *319 represented gains. The figures at the bottom of the first page under the designations "Deposit," "Cash purchase," and "Loan paid" represented the agents' attempt, from petitioner's records or from oral statements by petitioner's son, to reconcile the amount of income that was reported on petitioner's tax return as miscellaneous income with the figures they were getting from the records. On the second page the initials "LV" were used to represent Las Vegas, the initials "ELV" to represent El Rancho Vegas, and the initials "DI" to represent Desert Inn and "SAH," the Sahara. The designations were intended by the agents to represent the sources of the money deposited. The third page represented amounts of miscellaneous income from the sources there indicated reported on petitioner's 1952 income tax return. Petitioner's son stated to the agents that the bulk of the moneys in miscellaneous income other than the AAA payment and cattle sales was gambling winnings, either from Las Vegas or from the horse races. He made this statement while consulting documents contained in the manila folder he had produced. During the year 1952 petitioner's son was serving in the United States Air Force, *320 having been recalled to duty on March 7, 1951, and not discharged until March 7, 1953. Petitioner's son had not looked at the records from which he was attempting to identify the sources of miscellaneous income for the agents prior to the time of the meeting with the internal revenue agent and special agent in July 1957. Prior to the trial of this case a subpena was served on petitioner's son to produce his father's records for the years 1952 and 1953, and a notice to produce these same records was served on petitioner's counsel. No records were produced in response either to the subpena or the notice to produce, the explanation being offered that all of these records were in petitioner's custody in Mexico. Respondent on May 27, 1958, issued a notice of deficiency to petitioners in which he determined that petitioners had unreported income in the amount of $66,000 for the year 1952 and unreported income in the amount of $36,300 for the year 1953. Respondent gave the following explanation for his determination of deficiencies and additions to tax: This determination of your income tax and penalty liability is made upon the basis of information on file with the Internal Revenue *321 Service. Inasmuch as there was omitted from the gross income reported in your returns for the taxable years ended December 31, 1952, and December 31, 1953, items of income properly includible in gross income in excess of 25 per centum of the gross income reported in your returns, the deficiencies of income tax shown herein have been asserted in accordance with the provisions of sections 275(c) and 277 of the Internal Revenue Code of 1939. The penalties shown herein have been asserted in accordance with the provisions of sections of the Internal Revenue Code of 1939 as shown above. Ultimate Facts Respondent has failed to show by clear and convincing evidence that petitioners' income tax return for either the year 1952 or the year 1953 was false or fraudulent with intent to evade tax. Respondent has failed to establish that there was omitted from petitioners' income tax return for either the year 1952 or the year 1953 income properly includable in gross income in excess of 25 percent of the gross income reported. Opinion Both parties recognize that the assessment or collection of any deficiency is barred by the statute of limitations in the absence of fraud or the omission *322 from gross income of an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in the return. Respondent must prove fraud by clear and convincing evidence. Luerana Pigman, 31 T.C. 356, 370 (1958). Respondent has the burden to prove by a preponderance of evidence the omission from gross income of an amount in excess of 25 percent of the gross income reported. C. A. Reis, 1 T.C. 9 (1942), affd. 142 F. 2d 900 (C.A. 6, 1944). Respondent relies on the testimony of MacKenzie that he delivered to petitioner all the moneys received by him from Mickey and Seeman to establish that petitioner received income from payments made by applicants for liquor licenses. He relies on the analysis of income made by his agents and the fact that in prior years petitioner had reported gambling winnings as miscellaneous income to establish that the amounts which MacKenzie said he delivered to petitioner were not included in petitioner's income as reported on his tax return. A number of individuals testified that they delivered sums of money to Mickey and that they expected to receive favorable actions on applications *323 for liquor licenses in return for the money delivered to Mickey. Others testified that they delivered moneys for a similar purpose to Seeman. Both Mickey and Seeman testified that all the amounts that were delivered by applicants for liquor licenses were turned over to MacKenzie, but MacKenzie testified that Mickey was given 20 percent of the amounts she collected as a commission for collecting. Respondent accepts MacKenzie's testimony with respect to giving the 20 percent to Mickey by arguing that it is not logical to assume that Mickey would have done this collecting for no compensation, but argues, based on MacKenzie's testimony, that the remaining 80 percent was delivered by MacKenzie to petitioner. Mickey testified that MacKenzie had told her that he kept 40 percent of the funds she delivered to him and turned over the other 60 percent to petitioner. MacKenzie, in prior sworn testimony both before grand juries and at his own trials, denied ever receiving funds from Mickey or Seeman and denied collecting funds for petitioner. The testimony given at this trial by MacKenzie with respect to the story he told with respect to the robbery of his safe is directly contradicted by testimony *324 which the parties stipulated would be the testimony of Lee J. Robb, Captain of the San Bernardino Police Department were he called to testify. In response to the question, "And did you ever tell Captain Robb how much had been burglared from your home in 1953?," MacKenzie replied: Yes, I told him on two occasions. The first occasion I told him that approximately $2,400 to $2,600. I believe I told him $2,600 had been taken, which was this fund that my wife had accumulated for my daughter. Then, later, I went back to his office after they had failed to develop any clues in the case, and I told him that I'd had some advice and that my advice from an old-time police officer, who is very experienced in burglaries, was to put out the story that I had had an excessive amount of money in the safe and his reasoning was that if the people only got $2,400 and they were supposed to get $40,000, whatever it was, whatever it was according to this old-time officer, he felt that someone would get in trouble and his contention was the person who burglarized my safe was hired to make the principal rather angry and he said, "Somebody will come up dead and you will probably find out who did it." *325 * * *
* * * I explained that to Captain Robb at the time. * * * The parties stipulated as a part of the testimony that would be given by Lee J. Robb were he called as a witness, the following: "Captain Robb denied that Mr. MacKenzie ever discussed with him the putting out of this story and the spreading of it around in order to assist with the burglary investigation as a fictitious story." Even had MacKenzie never testified otherwise, it would be difficult to believe that he delivered to petitioner all of the moneys which Mickey and Seeman turned over to him from their collections from applicants for liquor licenses. Exactly the same reasons that respondent gives for accepting MacKenzie's testimony that Mickey was paid 20 percent of the amounts she collected as a collection fee, would cause us to doubt that MacKenzie kept no part of the amounts he received from Mickey and Seeman. The record in the instant case shows that in prior sworn testimony MacKenzie denied ever receiving money from Mickey and Seeman or collecting money in any way from applicants for liquor licenses on behalf of petitioner. MacKenzie's testimony in the instant case as to his reporting of the theft is contradicted *326 by the stipulated testimony of the captain of the San Bernardino Police Department. In this state of the record, we do not consider MacKenzie's testimony to be sufficient to support a finding of what amount, if any, of the funds paid by applicants for liquor licenses which came into MacKenzie's hands were delivered to petitioner. Even if respondent had established that some portion of the amounts which MacKenzie received through Mickey and Seeman from various applicants for liquor licenses had been delivered by MacKenzie to petitioner, respondent has failed to prove that such amounts were not reported by petitioner on his income tax returns for 1952 and 1953. Petitioner reported miscellaneous income of $39,435.28 and $43,534.84 for the years 1952 and 1953. No direct evidence with respect to the composition of this miscellaneous income for the year 1953 was offered by respondent. Respondent on the basis of evidence that in prior years petitioner had reported substantial amounts of gambling winnings asks the Court to assume that the miscellaneous income for the years 1952 and 1953 was likewise gambling winnings. This assumption is no more supported than the contra-assumption that petitioner *327 would include any income which he did not care otherwise to describe in miscellaneous income just as he had included gambling winnings in miscellaneous income. Respondent's agent could not say what portion of prior years' miscellaneous income was gambling winnings. [2]
*328 For the year 1952 the schedule which respondent argues shows gambling gains and losses by dates actually shows only $12,700 more gains than losses. Even if we indulge in respondent's assumption that he has proven that $13,500 of the deposits to petitioner's bank account constitutes gambling winnings, the remaining reported miscellaneous income is $25,935.28 of which only $1,304.78 is identified, leaving over $24,600 of unidentified miscellaneous income. Respondent has failed to prove that any sums collected from applicants for liquor licenses by MacKenzie which MacKenzie turned over to petitioner, were not included by petitioner in the miscellaneous income reported on his income tax return for each of the years 1952 and 1953. Because of this failure of proof on the part of respondent, any deficiencies determined by respondent are barred by the statute of limitations. Respondent bases much of his argument on the failure of petitioner to appear and testify at the trial and on the failure of petitioner to permit his son or attorney to produce his books at the trial. Petitioner offers many reasons in justification of his failure to appear or to permit his books and records to be *329 offered in evidence. We need not consider the validity of the reasons offered by petitioner since even if we assume, as respondent argues we should, that this failure on the part of petitioner creates an inference that his testimony and his books would not support his contention, respondent has pointed to no case where such an inference can be substituted for the clear and convincing evidence necessary to establish fraud. Cf. Joseph A. Indelicato, 42 T.C. 686 (1964). To establish an omission from gross income of an amount properly includable therein in excess of 25 percent of the amount reported, a definite amount of unreported income must be shown. A general inference that petitioner's books and records, if produced at the trial, would not in all respects support his contentions, is not sufficient to establish any definite amount of income omitted from petitioner's reported income. Decision will be entered for petitioner. Footnotes
1. All references are to the Internal Revenue Code of 1939, unless otherwise indicated.↩
2. In this regard the testimony is: Q. What did Mr. Bonelli tell you regarding the miscellaneous income reported on the returns for '46 through '50? * * *
THE WITNESS: May I say how he reported his income as I recall? THE COURT: Answer the question that counsel asked you, Mr. Witness, and leave it to counsel what questions he wants to ask you. THE WITNESS: Pardon me. There were gambling income, income from sale of cattle, salary income, income in one year from World Series winnings, income from gin rummy winnings. BY MR. SULLIVAN: Q. As you recall, how much of the miscellaneous income could be determined gambling income? A. I think it varied in the years, it went from, as I recall, $10,000 to $40,000 a year. * * *
Q. If you can state, could you state roughly what percentage of the miscellaneous income would be determined gambling income on his returns for these years? A. I don't believe I could give you the figure, the percentage. Q. Is it more than half? A. I really don't remember.↩