BERNARD J. CHES and ROSE CHES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ches v. Commissioner
Docket No. 6120-75
United States Tax Court
T.C. Memo 1976-387; 1976 Tax Ct. Memo LEXIS 19; 35 T.C.M. (CCH) 1750; T.C.M. (RIA) 760387; December 16, 1976, Filed *19 Held, the amount of gambling income received by petitioners determined. Held further, petitioners are liable for the addition to tax prescribed by sec 6653(b). Allen L. Schwait and L. Paige Marvel, for the petitioners. Robert B. Perry, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined a deficiency in petitioners' federal income tax liability for the calendar year 1971 in the *21 amount of $49,856.94. He also determined that petitioners are liable for an addition to tax pursuant to section 6653(b), I.R.C. 1954[1] in the amount of $24,928.47. The issues for decision are: (1) whether respondent's determination of the amount of gambling income received by petitioners in 1971 was excessive, and (2) whether any part of the understatement of petitioners' income on their 1971 return was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Bernard J. and Rose Ches, husband *22 and wife, resided in Baltimore, Maryland at the time they filed their petition herein. Petitioners filed a joint Federal income tax return for the calendar year 1971 with the District Director of Internal Revenue, Philadelphia, Pennsylvania. Hereinafter, petitioner will refer to Bernard J. Ches. During the year at issue petitioner was engaged in gambling activities, namely the receipt of lottery and horse wagers. The lottery was a conventional numbers game in which a bettor would place a wager on a 3-digit number. Winning numbers were based on the parimutuel payoffs of three predetermined races at a racetrack in the vicinity of Baltimore. When a number "hit", the backer of the operation paid the bettor at odds of 600-to-1. [2] Therefore, if a person $1bet and won he would receive $600 less the 10 percent commission due the writer. The average daily bet on a number was 50 cents. In a lottery such as the one involved herein a writer or runner, as opposed to the backer, does not receive the profits and losses from the operation. It is the writer's function to take "action" from bettors by recording the numbers and amounts wagered *23 and then calling in or delivering the bets to the backer. To preclude a "fix" the writer is required to turn in the bets for the day prior to the running of the first of the races from which the daily number is determined. [3] Should a "hit" occur the writer rechecks the lottery slips on which he has recorded the action for that day, receives the payoff from the backer, and pays that sum, less his commission, to the winner. Lottery slips are retained for several days by backers and writers for the purpose of making such checks at which time they are destroyed. For his services a writer will receive a commission as well as a percentage of any hits on numbers he has written. The following are illustrative of lottery slips. The 3-digit number is the number the bettor has played and the notation following that number reflects the amount wagered thereon. 306-
428-4
418-
528-4
412
483-4
215 [7]
618-4
212 inch
573-6
213
218-8
215
233-4
618
212-4
271 inch
369-4
272
572-4
Sources of action taken *24 by petitioner which would be reflected on such slips were his coworkers' at Crown Cork and Seal Co., Inc.[4] bets written by Al Marcantoni, a friend of petitioner, and bets written by George Wachter. At some time during 1971 Rose Ches became aware of petitioner's gambling activities.
At some time prior to November 7, 1971 the Baltimore police received several anonymous telephone calls concerning petitioner's gambling activities and proceeded to conduct a surveillance of petitioner's activities from November 7 through November 10. On November 11 the police raided petitioner's home and petitioners were arrested and charged with possession of lottery slips, maintaining a gambling establishment and bookmaking. A trial was held in the District Court for Baltimore County and petitioners were found guilty as charged.They appealed to the Circuit Court of Baltimore County and at trial, held on August 3, 1973, petitioner was found guilty and Rose Ches was acquitted of the charges. [5]
*25 During the course of the raid the police found and seized cash in the amount of $17,331.79. The mother, daughter, and grandson of petitioner filed petitions in the Circuit Court for Baltimore County alleging that the substantial part of such monies belonged to them. After a hearing on the merits the court by Order dated November 7, 1975 held that $6,168.28 of the funds seized belonged to Helen Ches, petitioner's mother; that $2,400 of the funds seized belonged to Christine Wachter, petitioners' daughter; that $3,771 belonged to Gregory Wachter, petitioners' grandson and the son of Christine Wachter); and that $4,992.51 was contraband forfeited to Baltimore County. In August, 1971 Christine Wachter became separated from her husband, George Wachter, and she and her infant son, Gregory, took up residence in petitioners' home. Commencing in June, 1971 Christine was employed by Esskay and, with the aid of $2,000 given to her by petitioner when she moved in, she was able to pay her own living expenses. Situated in petitioners' home was a "Snoopy" bank containing monies received as gifts on behalf of her son. In the course of the raid the police seized the "Snoopy" bank and found *26 therein approximately $6,000 consisting in part of 10 and 20 dollar bills wrapped around silver. [6]
In the course of the raid the police also seized assorted gambling paraphernalia, to wit lottery and horse betting slips. Following the raid the police examined the slips and calculated that the average gross action handled daily by petitioner was $1,300 consisting of $1,100 in lottery wagers and $200 in horse wagers. In arriving at these figures the police made the following assumptions concerning the lottery slips: (1) that the slips seized showed daily, as opposed to weekly, bets; (2) that each hyphen, dash, or number representing the amount wagered was equivalent to a dollar wager. In other words they interpreted 3654 to mean a $4 wager on the number 365. In fact each such marking represented a 25 cent unit. Included in the seized paraphernalia were gambling slips that were on the person of Al Marcantoni who arrived during the raid. Petitioners, on their 1971 return reported income from wages in the amount of $6,371.01 and interest in the amount of $437.23. They failed *27 to report any gambling income and did not maintain any books and records for the gambling operation. Respondent determined that petitioners had fraudulently failed to report gambling income in the amount of $104,520. In arriving at this figure respondent utilized the $1,300 per day gross figure as found by the Baltimore police and determined that petitioner had been the backer of the operation commencing on January 1, 1971. He thus determined petitioner's gross receipts to be $348,400 and allowed as a deduction $243,880 for operating expenses. OPINION Issue 1: Understatement of Income. It is respondent's position that the manner in which he reconstructed petitioner's gambling income was entirely reasonable in light of petitioner's failure to maintain books and records in connection with his gambling operation. Petitioners, on the other hand, contend that respondent's determination is so arbitrary as to lift the burden of proof from their shoulders. Further petitioners allege that the police calculation and respondent's determination which is based thereon rest on several erroneous assumptions. In particular they contend that petitioner was a runner or writer and was *28 not the backer of the operation; that petitioner was first engaged in gambling activities in July, 1971, not January, 1971; that the lottery slips seized by the police were weekly rather than daily slips; and that the police incorrectly computed the take represented by the seized slips. a. Burden of Proof. Petitioners argue that, upon proving respondent's determination to have no rational foundation in fact, a taxpayer is relieved of the burden of proving the correct amount of tax he may owe and that it is then incumbent upon us to determine the correct tax owing without regard to the presumption of correctness to which respondent's determination is normally entitled. Petitioners further contend that they have made the requisite showing and therefore no longer bear the burden of proof in the instant case. Petitioner has fairly stated the legal principle. See Harold E. Harbin,40 T.C. 373 (1963). However we disagree that petitioners have shown respondent's determination to be arbitrary.
It is well-settled that, where a taxpayer keeps no books or records, respondent is authorized to compute his income by whatever method will in his opinion clearly reflect the *29 taxpayer's income. Section 446(a) and (b) [7]; Harold E. Harbin,supra. Further, although respondent's computation must be reasonable, mathematical exactness is not required. This is particularly true in the case where the taxpayer has deliberately and willfully destroyed the records of his operation. In such a case respondent is not limited to any one method but may use any procedure reasonable under the circumstances. Shades Ridge Holding Co., Inc.,T.C. Memo. 1964-275, affd. sub nom. Fiorella v. Commissioner,361 F. 2d 326 (5th Cir. 1966). We think the facts before us clearly demonstrate the reasonableness *30 of the actions taken by respondent. It is conceded that petitioner engaged in gambling activities during 1971 and was convicted therefor. It is further conceded by petitioners that they received unreported gambling income and maintained no books and records in connection with the gambling operation. Thus when respondent entered the scene he was confronted with the task of reconstructing petitioner's gambling income having before him only the police records which stated that petitioner was the backer of a gambling operation entailing approximately $1,300 action per day. In light of the foregoing and the experience of the policemen who handled the investigation we think respondent's reliance on the police calculations was not only reasonable but the best possible method under the circumstances. Although we think respondent erred, in part, as will be discussed infra, his determination is not at all arbitrary and petitioners must bear the burden of proving it is erroneous. b. Petitioner's Gambling Activities. Respondent, in arriving at his determination, made the assumptions that petitioner was the backer of the operation and that petitioner commenced his gambling activities *31 at the inception of 1971. Petitioner contends that he was a writer for a backer claimed to be now deceased. Further petitioners claim that petitioner commenced his gambling activities in July, 1971. As noted above respondent's determination is not arbitrary and petitioners bear the burden of establishing the facts on which they rely. Welch v. Helvering,290 U.S. 111 (1933). Petitioners have simply not met their burden. At trial considerable testimony was proffered by and on behalf of petitioners in support of the facts they urge us to find. However, we are unable to find such testimony to be reliable and worthy of belief. Petitioner himself has been twice convicted of gambling and his testimony as well as that of the members of his family is obviously self-serving. Al Marcantoni was also involved in the gambling operation and his credibility did not impress us. Further, with the exception of Al Marcantoni, the witnesses on behalf of petitioners were admittedly unaware of petitioner's gambling activities until sometime after they began. Hence they are of no probative value in ascertaining the precise date on which petitioner became involved in the operation *32 and whether or not petitioner was the backer thereof. Respondent's determination is, in this respect, sustained. c. The Police Computation. It is conceded by respondent that he relied upon the police computation that petitioner was handling $200 in horse bets and $1,100 in lottery bets daily in making his determination. Petitioners contend that these calculations are incorrect in the following respects: (1) the police misinterpreted the code utilized on the slips to disclose the amount wagered on a particular number; (2) petitioner did not take horse bets; and (3) the correctly calculated gross take, whatever it may be, was weekly and not daily action. We agree that the $1,100 per day figure for the lottery is excessive. In calculating the total amount wagered from the lottery slips seized at petitioners' home the police assumed that each number or mark following the 3 digit number played represented a dollar wagered on that number. We believe that this assumption is erroneous for several reasons. First, based thereon the police found numerous $1 and $2 bets as well as a $20 and a $40 bet. These are unusually high figures. We believe that a lottery player will, typically, *33 wager 50 cents per day on a number, a figure considerably lower than those found by the policemen who calculated petitioner's action. In fact the testimony of those policemen at trial indicated that an average lottery bet would be 50 cents and that many of the wagers recorded on the seized slips appeared to be abnormally high. Further, were the police assumption taken as fact, the result obtained would have bettors, many of whom were workers at Crown Cork and Seal Co., Inc., wagering as much as $24 per week on the numbers game. We doubt if such persons earned sums greatly in excess of that earned by petitioner who had been employed there over 30 years, and for this reason believe it unrealistic to assume they would wager such an amount. Furthermore, the testimony adduced by respondent demonstrated that the average daily bet handled by petitioner was 50 cents. In order to have taken $1,100 in lottery bets petitioner would have had to have had in his possession slips showing 2,200 bets at the time of the raid. To the contrary, however, the testimony and documentary evidence shows a much smaller number of wagers in petitioner's possession at the time of the raid. We believe that *34 each coded mark or number represented a 25 cent wager rather than a $1 wager. We therefore hold that petitioner's daily lottery action was but one-fourth of that determined by respondent or $275 per day.
However, we reject petitioners' contentions with respect to the handling of wagers placed on horse races and whether or not the lottery slips represented weekly rather than daily bets.In both instances their case rests solely upon the testimony of the same persons who testified that petitioner commenced his gambling activities in mid-1971. As noted above we did not find them to be credible witnesses and again cannot accept their testimony with respect to these contentions. Respondent's determination in this connection is hereby sustained. Our conclusions above result in a mathematical finding that the petitioner's gambling action in 1971 grossed $475 per day for 44 6-day weeks plus $475 per day for 3 additional days to November 11, 1971. Respondent has conceded that the above gross figures should be reduced by 70 percent "operating charges" to arrive at petitioner's net income from gambling, all of which was unreported. Issue 2: Fraud Issue. The final issue is *35 whether petitioners are liable for the addition to tax for fraud imposed by section 6653(b). The burden of proving fraud is on respondent and it must be proven by clear and convincing evidence. Section 7454. [8] After a careful review of the record we believe respondent has met his burden. *36 Our findings on the first issue indicate that petitioners received and failed to report gambling income in 1971 in an amount that greatly exceeded their income from other sources. We found their explanation of such omission to be incredible. Although petitioner admitted being informed about the necessity of acquiring a tax stamp, both he and his wife testified that they did not believe gambling income need be reported. In this connection we note that petitioners failed to mention this to their friend who prepared their 1971 return. The fact of the matter is that petitioner's failure to report his gambling income was part and parcel of a systematic plan, which included the methodical and orderly destruction of lottery slips, to conceal his clandestine and illegal activities from the authorities. Such activities clearly evidence a motive to operate outside the scope of both local criminal laws and Federal tax laws. Shades Ridge Holding Co., Inc.,supra. We simply have no doubt that petitioner was aware that gambling income is taxable. Admittedly, respondent has not proffered direct evidence pertaining to petitioners' state of mind at the time their *37 1971 return was filed. However, a taxpayer's state of mind can seldom if ever be established by direct proof. Luerana Pigman,31 T.C. 356 (1958). To require respondent to rely thereon would result in our rewarding adept concealment.This we refuse to do. We hold petitioners are liable for the penalty prescribed by section 6653(b). Decision will be entered under Rule 155. Footnotes
1. SEC. 6653(b)↩. Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of each spouse.
2. The odds against a hit are 1,000-to-1.↩
3. In those instances in which a bettor played the same number all week the bet had to be placed and called in prior to the first such race on Monday.↩
7. SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING. (a) General Rule.--Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. (b) Exceptions.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.↩
4. Petitioner was employed there for over 30 years.↩
5. On October 23, 1969, petitioners were arrested and charged with bookmaking, possession of lottery slips, and maintaining a gambling establishment. A trial was held on March 18, 1970 in the Circuit Court and petitioner was found guilty of the charges. The case against Rose Ches was settled.↩
6. It is unclear whether this amount is included or is in addition to the aforenoted $17,331.79.↩
8. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud.--In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary or his delegate. (b) Foundation Managers.--In any proceeding involving the issue whether a foundation manager (as defined in section 4946(b)) has "knowingly" participated in an act of self-dealing (within the meaning of section 4941), participated in an investment which jeopardizes the carrying out of exempt purposes (within the meaning of section 4944), or agreed to the making of a taxable expenditure (within the meaning of section 4945), the burden of proof in respect of such issue shall be upon the Secretary or his delegate. (c) Cross Reference.--For provisions relating to burden of proof as to transferee liability, see section 6902(a).↩