WOODROW W. COMPTON AND JEANETTE COMPTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Compton v. Commissioner
Docket Nos. 11673-79, 9970-80.
United States Tax Court
T.C. Memo 1983-642; 1983 Tax Ct. Memo LEXIS 150; 47 T.C.M. (CCH) 124; T.C.M. (RIA) 83642; October 17, 1983. Joe C. Luker, Jr. and Charles J. Lincoln, for the petitioners. William P. Hardeman, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: Using the net worth plus nondeductible expenditures method to reconstruct income, respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax: Addition to Tax
Docket No.
Year
Deficiency
Section 6653(b) [1]
9970-80
1968
$3,372.92
$1,686.46
9970-80
1969
2,658.44
1,576.74
9970-80
1970
7,063.86
3,531.93
9970-80
1971
4,480.00
2,240.00
11673-79
1972
10,519.61
5,259.81
*152 The issue for decision in these consolidated cases is whether assessment of any deficiencies that may exist is barred by the statute of limitations. FINDINGS OF FACT Petitioners Woodrow W. Compton ("Woodrow") and Jeanette Compton ("Jeanette") are husband and wife. At the time they filed their petitions in these cases they resided in West Memphis, Arkansas. Petitioners timely filed Federal income tax returns for the taxable years 1968 through 1972 with the Internal Revenue Service Center in Austin, Texas. [2]
In November 1964 Woodrow was convicted by the United States District Court for the Western District of Tennessee of traveling in interstate commerce with intent to carry on an unlawful gambling establishment. See 18 U.S.C. sec. 1952 (1964). He was fined $5,000 and sentenced to five years in prison. Later that month he paid the fine and appealed his conviction. In May 1966 the *153 Court of Appeals affirmed the District Court. In June 1966 Woodrow was incarcerated in the Federal penitentiary at Terre Haute, Indiana. He was released in May 1968 and placed on probation for the remainder of his original sentence. Shortly after he was incarcerated, Woodrow requested his attorney to attempt to have his sentence suspended or reduced. A $25,000 fee, contingent upon the attorney's success, was agreed upon. Cash in that amount was delivered to the attorney by Henry Compton ("Henry"), Woodrow's younger brother. In July 1966 a petition for reduction of sentence was filed with the District Court. However, the petition was denied. Shortly thereafter the attorney returned the cash to Henry. Henry was able to deliver cash to his brother's attorney because Woodrow had entrusted him with approximately $40,000 in cash prior to the time he was indicted. Woodrow had accumulated this sum over a period of years. He asked Henry to hold the cash for him because he thought no one would suspect his brother (unlike himself) of possessing such a large amount of money. Woodrow customarily kept large amounts of cash on hand, in part to finance his gambling activities and in *154 part because he was generally suspicious of banks and other financial institutions.He only had a third-grade education and did not even know how to write a check. After an attempted burglary of Henry's house in 1967, Henry transferred his brother's cash to Valley Clark, Woodrow's sister. She kept the cash for the rest of the time Woodrow was in prison. During this period she never used any of her brother's cash. Henry also never used any of his brother's cash except to pay for travel expenses incurred in transporting family members to visit Woodrow in prison. When Woodrow returned home in May 1968, approximately $35,000 remained from the amount originally entrusted to Henry. Shortly before he was sent to prison, Woodrow sold his house on Maratavia Drive in Memphis, Tennessee and purchased another house in Memphis on Slumber Lane, close to where Henry lived. Woodrow did this because he wanted his wife and child to live in his brother's neighborhood while he was in prison. Because he was not employed at the time, Woodrow was unable to qualify for a loan. Henry, on the other hand, was employed. Accordingly, the house was purchased in Henry's name. However, the $5,000 downpayment *155 and all of the monthly payments were made by Woodrow or Jeanette. While Woodrow was in prison, Jeanette lived frugally in the house on Slumber Lane with her child. During this period she was not employed. However, she was not without financial resources. For example, approximately $8,250 had been realized from the sale of the Maratavia Drive property in 1966. Earlier that year nearly $35,000 had been realized from the sale of an establishment known as the Aristocrat Club in Millington, Tennessee. And shortly after Woodrow was sent to prison, $4,000 was realized from the sale of two automobiles.In addition, a $10,000 cash appearance bond was refunded by the District Court in June 1966. Jeanette successfully supported herself and her child by drawing on these funds. In fact, when Woodrow returned from prison, a substantial part of these funds remained untouched. Woodrow was released from prison in May 1968. He had been without any income for two years. However, he had available the surplus funds referred to in the preceding paragraph as well as the previously-described $35,000 in cash. Woodrow used these amounts during the years in issue to support his family and to acquire *156 new assets. In 1968 Woodrow sold his house on Slumber Lane, recouped his original investment, and moved to Pine Bluff, Arkansas. He purchased the Yellow Cab Company in Pine Bluff for $30,000. He paid $5,000 down and $5,000 in 1969. In July 1970 he sold the company to his brother Billy Gene Compton for $30,000, his original purchase price. Woodrow also purchased three automobiles in 1968: a Jeep, a 1968 Mustang, and a 1969 Oldsmobile. In each case he made a cash downpayment and financed the balance of the purchase price. In 1969 Woodrow purchased a house on West 34th Street in Pine Bluff, Arkansas. He borrowed $4,000 from a local business associate to apply towards his $15,000 downpayment. Woodrow borrowed that sum in order to avoid the inconvenience of a trip to Memphis to obtain the necessary cash. He satisfied the loan within a week or ten days. Woodrow also purchased a Ford Bronco in 1969 by trading in his Jeep. Late in 1970 Woodrow moved to Texarkana, Arkansas. Earlier that year he purchased a part interest in a number of businesses there for $75,000. These businesses included a cab company, a rent-a-car company, and a finance company. He paid $15,000 down and *157 $10,000 in each of the following two years. Woodrow also purchased a Buick in 1970 for $4,900. In 1971 Woodrow purchased a house on Downing Street in Texarkana by making an $18,000 downpayment. He had previously sold his house on West 34th Street in Pine Bluff. He also purchased a 1972 Oldsmobile for cash in the amount of approximately $5,400 and a 1970 Ford Bronco by assuming the seller's existing note. In 1972 Woodrow purchased a 1973 Buick Regal for $4,300. He also arranged for a builder to construct a house for him on Cambridge Street in Texarkana. However, he did not make the downpayment nor pay any part of the purchase price until 1973. During the years in issue Woodrow gambled at dice. In the fall of 1973 respondent began to investigate Woodrow for possible criminal tax violations. Although Woodrow was subsequently indicted, the United States dismissed the indictment prior to trial. At the direction of his attorney, Woodrow did not cooperate with the special agent during the agent's investigation. Also at the direction of his attorney, Woodrow retrieved a financial statement which he had submitted to bank. The financial statement related to a mortgage loan *158 which was made in 1973. Woodrow subsequently destroyed the document. On June 6, 1979, respondent mailed the notice of deficiency for 1972. On May 14, 1980, he mailed the notice for 1968 through 1971. Respondent determined deficiencies for all five years by reconstructing petitioners' income using the net worth plus nondeductible expenditures method. [3]
ULTIMATE FINDINGS OF FACT Respondent failed to prove by clear and convincing evidence *159 any underpayment of tax for any of the years in issue. Respondent failed to prove fraud by clear and convincing evidence. OPINION Respondent sent petitioners the notices of deficiency for 1968 through 1972 more than three years after they filed their Federal income tax returns for those years. Petitioners contend that assessment of any deficiencies that may exist is therefore barred by the general 3-year statute of limitations. Section 6501(a). [4] Respondent, on the other hand, contends that the deficiencies may be assessed at any time because petitioners filed false and fraudulent returns with intent to evade tax. Section 6501(c)(1). [5] In the alternative, respondent contends that the deficiency for 1972 may be assessed pursuant to the 6-year statute of limitations because petitioners omitted from their return for that year gross income in excess of 25 percent of reported gross income and because the statutory notice was sent within 6-years after the return was filed. Section 6501(e)(1)(A). [6] For the reasons which follow, we agree with petitioners. *160 False Return Exception Taxable Years 1968 through 1972
Under the false return exception to the general 3-year statute of limitations, the Commissioner may assess a deficiency at any time if the taxpayer filed a false or fraudulent return with intent to evade tax. Section 6501(c)(1); section 301.6501(c)-1(a), Proced. & Admin. Regs. As with any exception to section 6501(a), the Commissioner bears the burden of pleading and proving that the exception is applicable. Bonwit Teller & Co. v. Commissioner,10 B.T.A. 1300 (1928); Farmers Feed Co. v. Commissioner,10 B.T.A. 1069 (1928). In his answers respondent alleges that petitioners' failure to report taxable income in the amounts determined by him in the notices of deficiency was fraudulent with intent to evade tax. In order for respondent to establish the applicability of section 6501(c)(1), he must demonstrate that petitioners acted fraudulently within the meaning of section 6653(b). [7]Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976). If he is to succeed, respondent must prove by clear and convincing evidence for each of the years in issue that (1) there was *161 an underpayment of tax and (2) some part of such underpayment was due to fraud.Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Hebrank v. Commissioner,81 T.C. No. 36 (Sept. 26, 1983); Pigman v. Commissioner,31 T.C. 356, 370 (1958); see Goodwin v. Commissioner,73 T.C. 215, 226-227 (1979); Considine v. Commissioner,68 T.C. 52, 68 (1977). [8] Both elements of respondent's burden involve questions of fact. Grosshandler v. Commissioner,75 T.C. 1, 19 (1980); Stratton v. Commissioner,54 T.C. 255, 284 (1970), modified on another issue 54 T.C. 1351 (1970). [9] We will discuss each of them in turn. *162 Underpayment
Without an underpayment of tax there can be nothing to which the 50-percent addition to tax for fraud can attach. Thus, affirmative proof of an underpayment is a necessary part of the Commissioner's burden. To prove an underpayment, the Commissioner is not required to establish the precise amount of the deficiency determined by him. However, he cannot discharge his burden by simply relying on the taxpayer's failure to prove error in his determination of the deficiency. [10]Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Pigman v. Commissioner,31 T.C. at 370. [11] Any rule to the contrary would "allow the Commissioner to raise himself by his own bootstraps." George v. Commissioner,338 F.2d 221, 223 (1st Cir. 1964). *163 In the cases before us respondent attempted to establish an underpayment (1) by proving that Woodrow gambled during the years in issue and (2) through a net worth analysis. He was required to do this by clear and convincing evidence. In our opinion he failed to do so. Although Woodrow gambled during the years in issue, there is no direct evidence that he had net income from gambling. Net income from gambling is, of course, the excess of gambling winnings over gambling losses. See section 1.165-10, Income Tax Regs.[12] Respondent attempted to prove indirectly that Woodrow has net income from gambling through a net worth analysis. However, respondent offered such a paucity of evidence to support his analysis that we cannot conclude that there was an underpayment of tax for any of the years in issue. [13]
No useful purpose would be served for us to dissect respondent's net worth analysis. We will, however, discuss a few of its major shortcomings. We should also point out that one *164 does not prove a net worth analysis by asking the special agent to read it out loud or to state in a conclusory manner whether the analysis is correct, or by asking the taxpayer whether the analysis comprehensively sets forth every asset and liability. Respondent determined through his net worth analysis that petitioners had unreported income in 1968 in the amount of $14,546.89. At trial, however, the special agent admitted that he analyzed the source and application of petitioners' funds for 1966 and 1967 and determined that petitioners had funds available at the end of 1967 in the amount of $15,894.03. [14] He also admitted that no part of this $15,894.03 was included in petitioners' opening net worth for 1968 and that, if it were, the deficiency for that year would be completely eliminated. *165 Respondent determined through his net worth analysis that petitioners had unreported income in 1969 and 1971 in the amounts of $9,811.70 and $14,292.77, respectively. He also determined that their personal living expenses for those years amounted to $17,586.03 and $22,145.47, respectively. However, respondent did not explain how these amounts were derived nor did he make any effort to prove them. Without these amounts there is no understatement of income and hence no underpayment of tax for 1969 and 1971. Respondent determined through his net worth analysis that petitioners had unreported income in 1972 in the amount of $27,780.54. He determined this amount as follows: Increase in net worth
$31,924.94 plus: Personal living expenses
21,620.47 less: Section 1202 deduction
(1,457.19)
Adjusted gross income
52,088.22 less: Reported AGI
(24,307.68)
Unreported income
$27,780.54 According to respondent's analysis, the increase in net worth is largely attributable to a $20,000 downpayment made on the house on Cambridge Street in Texarkana. However, we have previously found that petitioners did not make a downpayment nor pay any part of the purchase *166 price until 197 3. Furthermore, respondent did not explain how he determined the amount of personal living expenses nor did he make any effort to prove that amount. Without these two items there is no understatement of income and hence no underpayment of tax for 1972. Fraudulent Intent
If the Commissioner proves that there was an underpayment of tax, he must then prove by clear and convincing evidence that some part of that underpayment was due to fraud. Fraud is never imputed or presumed and a mere suspicion is insufficient to sustain a finding of fraud. Estate of Mazzoni v. Commissioner,451 F.2d 197 (3d Cir. 1971), affg. a Memorandum Opinion of this Court; Carter v. Campbell,264 F.2d 930, 935 (5th Cir. 1959); Beaver v. Commissioner,55 T.C. 85, 92 (1970). "The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941). In order to establish fraud the Commissioner must show that the taxpayer intended to evade taxes, which he knew or believed he owed, by conduct *167 intended to conceal, mislead, or otherwise prevent the collection thereof. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); Acker v. Commissioner,26 T.C. 107, 111-112 (1956). Fraud must be affirmatively established. Drieborg v. Commissioner,225 F.2d 216, 218 (6th Cir. 1955), affg. in part a Memorandum Opinion of this Court. Consequently, the Commissioner cannot simply rely on a taxpayer's failure to satisfy his burden of proof as to the underlying deficiency. George v. Commissioner,338 F.2d at 223; Otsuki v. Commissioner,53 T.C. at 106; Pigman v. Commissioner,31 T.C. at 370. [15]
We concluded above that respondent failed to prove that there was an underpayment of tax for any of the years in issue. *168 Although this obviates the necessity of inquiring into petitioners' intent, we shall proceed as if respondent proved that there was an underpayment and discuss the issue of intent. As previously stated, respondent must prove by clear and convincing evidence that petitioners acted fraudulently. He attempts to do this by invoking several classic indicia of fraud. In our opinion, however, he failed to carry his burden. We shall briefly discuss the principal facts on which respondent relies. Respondent relies on the well-established principle that a consistent pattern of underreporting substantial amounts of income over a period of several years is a strong indicium of fraud. See Holland v. United States,348 U.S. 121, 139 (1954). However, even if the burden of of disproving the deficiencies rests with petitioners (see footnote 10, supra), we are satisfied that there is no such pattern here. We have already noted that the special agent determined that petitioners had sufficient funds on hand at the end of 1967 to completely eliminate the deficiency for 1968. Indeed, given the errors in the agent's analysis (see footnote 14, supra), petitioners also *169 had sufficient funds on hand to eliminate the deficiency for 1969. Furthermore, we have found that when Woodrow was released from prison in May 1968, he had approximately $35,000 in cash which he had previously entrusted to his brother. This amount exceeds the understatement for 1970, and the balance exceeds half of the understatement for 1971.It would therefore eliminate the deficiency for 1970 and substantially reduce the deficiency for 1971. We are satisfied that during the years in issue petitioners actually expended this cash, as well as the funds otherwise available to them. After all, Woodrow had just spent two years in prison and it appears natural that petitioners would have utilized all of their available resources in order to resume a normal life. This leaves the understatement for 1972. That understatement is largely attributable to a $20,000 downpayment made on the house on Cambridge Street in Texarkana. However, we have found that petitioners did not make the downpayment nor pay any part of the purchase price until 1973. Thus, we are left with modest deficiencies for only two years--1971 and 1972. In our view, this hardly constitutes a consistent pattern of *170 underreporting substantial amounts of income over a period of several years. Respondent also relies on the fact that petitioners dealt in cash. However, Woodrow did not complete elementary school and did not even know how to write a check. He also did not have much confidence in financial institutions and customarily kept a large amount of cash on hand.
Respondent also relies on the fact that petitioners purchased a house in 1966 in the name of Henry Compton, Woodrow's brother. At the time, however, Woodrow was not working and was about to go to prison. He was told that a mortgage could not be obtained under these conditions. Because Henry was employed and could obtain a loan, the house was titled in his name. Respondent also relies on the fact that Woodrow did not cooperate with the special agent during the investigation. However, Woodrow may very well have been intimidated by the agent, given the tremendous educational disparity between them, and have preferred that all contact be through a professional representative. Moreover, given the fact that he was under criminal investigation, it is understandable that he heeded his attorney's advice concerning cooperation. *171 Respondent also relies on the fact that during the special agent's investigation Woodrow retrieved, and subsequentely destroyed, a financial statement that he had submitted to a bank when applying for a mortgage loan. We find this action very disturbing. Destruction of records is one of the classic indicia of fraud. Spies v. United States,317 U.S. 492, 499 (1943). Nevertheless, we cannot conclude from Woodrow's action that respondent has carried his burden of proof. The financial statement relates to a loan that was made in 1973, so it is possible that it did not contain information relevant to the years before us. Moreover, in retrieving the statement, Woodrow acted at the direction of his attorney. In any event, as we stated earlier, a mere suspicion is insufficient to sustain a finding of fraud. Respondent also relies on the fact that at trial petitioners did not produce books and records relating to Woodrow's gambling activities. Respondent cites Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947), for the proposition that a party's failure "to introduce evidence *172 within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." However, when quoted in context, it is apparent that this proposition cannot be divorced from the proper allocation of the burden of proof: Petitioner has not established the factual allegations in its petition which are material and essential. Respondent was under no obligation to introduce evidence to rebut a fact alleged but not proven by petitioner. The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. This is especially true where, as here, the party failing to produce the evidence has the burden of proof or the other party to the proceeding has established a prima facie case. [6 T.C. at 1165; emphasis added; citations omitted.] Here respondent, not petitioners, bears the burden of proof. It was he who alleged that they had income from gambling during the years in issue.Respondent could have, but did not, subpoena petitioners' records. Neither *173 his failure to do so nor his failure to establish a prima facie case requires that petitioners affirmatively offer their own records. To require otherwise would be tantamount to reallocating the burden of proof. Finally, respondent relies on the fact that petitioners frequently financed the acquisition of assets rather than purchasing them for cash. He actually uses this fact in an effort to discredit what he characterizes as petitioners' belated cash hoard defense. [16] However, petitioners simply did not have the financial resources to acquire every asset with cash. Even if they could have, it might have been foolish for them to do so because they would have lost the obvious advantage of leveraging. Most importantly, using our best judgment after reviewing all of the evidence, we have found that of the cash originally entrusted to Henry, approximately $35,000 remained when Woodrow was released from prison. See Potson v. Commissioner,22 T.C. 912, 928-929 (1954), affd. sub nom. Bodoglau v. Commissioner,230 F.2d 336 (7th Cir. 1956); Friedman v. Commissioner,T.C. Memo. 1968-145, affd. per curiam 421 F.2d 658 (6th Cir. 1970). *174 In view of the foregoing, we hold that the false return exception to the general 3-year statute of limitations is not applicable to the taxable years 1968 through 1972. 6-Year Statute of Limintations Taxable Year 1972
If a taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the Commissioner may assess a deficiency within 6 years after the return was filed. Section 6501(e)(1); section 301.6501(e)-1(a)(1), proced. & Admin. Regs. The burden of proving the existence of a 25-percent omission of gross income is on the Commissioner. Stratton v. Commissioner,54 T.C. at 289; Reis v. Commissioner,1 T.C. 9 (1942), modified by a Memorandum Opinion of this Court dated June 4, 1943, affd. 142 F.2d 900 (6th Cir. 1944). The Commissioner cannot satisfy that burden by simply relying on the presumption *175 of correctness which ordinarily attaches to his determinations. Reis v. Commissioner,supra.[17] Rather, he must actually prove the amount of the omitted gross income. Davenport v. Commissioner,48 T.C. 921, 928 (1967). In a net worth case the Commissioner must also prove that unreported income is attributable to omitted gross income rather than excessive deductions. Courtney v. Commissioner,28 T.C. 658, 668 (1957); Hurley v. Commissioner,22 T.C. 1256, 1264-1265 (1954), affd. on another issue 233 F.2d 177 (6th Cir. 1956). Here respondent sent the notice of deficiency for 1972 within 6 years after petitioners filed their income tax return for that year. In his answer in Docket No. 11673-79, respondent alleges (and petitioners admit) that the amount of gross income stated in petitioners' return was $30,679.40. Twenty-five percent of that amount is $7,669.85. Respondent also alleges that petitioners underreported *176 their adjusted gross income for 1972 by $27,780.54 and that all of this amount represents gross income from gambling. Because the alleged understatement exceeds 25 percent of petitioners' reported gross income, respondent concludes that the statutory notice was timely issued and that assessment is not barred by the statute of limitations. We disagree. As previously stated, respondent bears the burden of proof on this issue. He must therefore prove the amount of unreported income and show that it is attributable to omitted gross income and not excessive deductions. In our opinion respondent has failed to carry his burden. In alleging that petitioners had unreported adjusted gross income of $27,780.54, respondent used the net worth method to reconstruct their income. The alleged understatement is principally attributable to personal living expenses in the amount of $21,620.47 and the downpayment on the house on Cambridge Street in Texarkana in the amount of $20,000. However, we have found that petitioners did not make the downpayment nor pay any part of the purchase price until 1973. Furthermore, respondent did not prove that petitioners incurred personal living expenses *177 in the amount alleged or, for that matter, in any lesser amount that might give rise to a 25-percent omission of gross income. Without these two items, the net worth analysis does not give rise to any unreported income.[18]
In view of the foregoing we hold that the 6-year statute of limitations is not applicable to the taxable year 1972. In order to give effect to our conclusions herein, Decisions will be entered for petitioners.
Footnotes
1. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. The return for 1972 was filed on June 8, 1973, pursuant to an application for extension of time to file.↩
3. Respondent reconstructed petitioners' income as follows: ↩
1968
1969
1970
1971
1972
Increase in
net worth
$9,353.98 $10,091.93 $25,647.60 $17,635.32 $31,924.94 plus: Personal
living
expenses
8,192.91 17,586.03 19,079.74 22,145.47 21,620.47 less: Tax
refund
(4,522.18)
less: Section 1202
deduction
(1,097.95)
(1,252.57)
(1,457.19)
plus: Non-
deductible
loss (sale
951.84 of auto)
Adjusted
Gross Income
$17,546.89 $24,107.62 $43,629.39 $38,528.22 $52,088.22 less: reported AGI
(3,000.00)
14,295.92 15,999.77 24,235.45 24,307.68 Unreported
income
$14,546.89 $ 9,811.70 $27,629.62 $14,292.77 $27,780.54 4. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) GENERAL RULE.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * *, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. ↩
5. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (c) EXCEPTIONS.-- (1) FALSE RETURN.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. ↩
6. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (e) SUBSTANTIAL OMISSION OF ITEMS.--Except as otherwise provided in subsection (c)-- (1) INCOME TAXES.--In the case of any tax imposed by subtitle A-- (A) GENERAL RULE.--If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *↩
7. SEC. 6653. FAILURE TO PAY TAX. (b) FRAUD.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. (c) DEFINITION OF UNDERPAYMENT.--For purposes of this section, the term "underpayment" means-- (1) INCOME * * * TAXES.--In the case of a tax to which section 6211 (relating to income * * * taxes) is applicable, a deficiency as defined in that section (except that, for this purpose, the tax shown on a return * * * shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing) * * * ↩
8. See also Cleveland v. Commissioner,T.C. Memo. 1983-299; Metas v. Commissioner,T.C. Memo. 1982-36↩. 9. See also Cleveland v. Commissioner,supra↩ at n. 8.
10. It is only if and when the Commissioner establishes an underpayment by clear and convincing evidence that his deficiency determination will enjoy its usual presumption of correctness. Cleveland v. Commissioner,supra↩ at n. 8. As in the usual case, the burden of proof in respect of that determination will then rest with the taxpayer. 11. See also Raymond v. Commissioner,T.C. Memo. 1983-607; Carr v. Commissioner,T.C. Memo. 1978-408↩.
12. See also Metas v. Commissioner,supra↩ at n. 8. 13. This paucity of evidence is responsible for our rather abbreviated findings of fact, an unusual occurrence in a net worth case.↩
14. The agent testified that this amount did not include any part of petitioners' cash hoard but rather included only those funds the source of which he could verify to his satisfaction. Nevertheless, this amount is actually understated↩ for at least three reasons. First, the agent erroneously determined the year in which petitioners paid a $5,000 fine. Second, he overlooked the sale of two automobiles for $4,000.Third, he estimated personal living expenses using data from the Bureau of Labor Statistics for a family of three for a year in which Woodrow was in prison for seven months.
15. See also Raymond v. Commissioner,supra at n. 11; Canzano v. Commissioner,T.C. Memo. 1983-320; Carr v. Commissioner,supra↩ at n. 11.
16. We fail to comprehend how respondent can characterize this defense as "belated." Petitioners raised it no later than January 1975 at a conference with respondent's counsel in Dallas, Texas, nearly 8 years↩ before the trial herein.
17. See also Raymond v. Commissioner,supra at n. 11; Carr v. Commissioner,supra at n. 11; Macri Corporation v. Commissioner,T.C. Memo. 1976-273↩.
18. We should not be understood to imply that we think respondent proved the remaining items in the net worth analysis. Rather, in most instances the record reflects such a dearth of evidence that we could not reach such a conclusion.↩