HOWARD A. PROCTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Proctor v. Comm'r
Docket No. 17869-83. United States Tax Court
T.C. Memo 1985-503; 1985 Tax Ct. Memo LEXIS 127; 50 T.C.M. (CCH) 1166; T.C.M. (RIA) 85503; September 25, 1985. *127 Christine Colley, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following deficiencies in income tax and additions to tax against petitioner: Addition to Tax, I.R.C. 1954,
Year
Deficiency
Section 6653(b)
1979
$3,570.93
$1,785.47
1980
8,323.83
4,161.92
1981
5,956.97
2,978.49
This case involves the Commissioner's determination that petitioner failed to report certain income (primarily non-employee compensation) received during each of the years in issue, and that at least a portion of the resulting underpayment of tax for each year was due to fraud. Petitioner's position, as set forth in the pleadings, is that he incurred allowable business expenses, in particular, expenses relating to the business use of his automobile, which offset the amounts determined as not having been reported. When the case was called from the trial calendar at Boston, on October 1, 1984, there was no appearance by or on behalf of petitioner. Respondent's counsel moved that the case be dismissed for lack of prosecution to the extent that it related to the basic deficiencies of *128 $3,570.93, $8,323.83, and $5,956.97 for the years 1979, 1980, and 1981, respectively, apart from the section 6653(b) additions. That motion was granted, and the case was set for trial on the section 6653(b) additions for fraud. Respondent's counsel assumed the burden of proof in respect of that fraud issue. When this case was called on October 10, 1984, for trial on the fraud issue there was again no appearance by or on behalf of petitioner. Respondent's counsel presented in evidence certain documentary materials as well as the testimony of three witnesses. FINDINGS OF FACT Petitioner resided in Massachusetts when he filed his petition herein. He had a Bachelor of Science Degree and impressed people as being intelligent. Sometime shortly before the years in issue, petitioner began working for Central Delivery Service of Massachusetts (Central Delivery). Central Delivery was engaged in the business of delivering small packages, etc., for its customers throughout New England, specializing in "same-day" delivery and offering both "demand" and "route" service. Its "demand" service involved picking up and delivering parcels as directed by customers. Its "route" service entailed *129 its making pre-arranged stops along specific routes (a "line-haul") on a once- or twice-daily basis. The "demand" service was used mostly by "law firms, graphic artists, [and] bank[s]", whereas the "route" service was used primarily by retail establishments like "Sears, Caldors * * *, Bradlee[s] * * * [and] Toys-R-Us". It would appear that such latter service involved primarily the transportation of merchandise from a unit or outlet of the customer in one community to a unit or outlet of the same retailer in another community. Central Delivery used the services of "contract drivers" to make its pickups and deliveries. These drivers supplied their own vehicles and normally worked a five-day week. Petitioner was onw of a number of such contract drivers, but sometimes on weekends he also worked as a part-time dispatcher. After completing work for Central Delivery, a driver would submit a "manifest" (presumably daily or weekly) to the company which listed the points of pickup and delivery of each of his jobs. Central Delivery's charges to its customers were based on mileage, calculated by use of a standardized mileage guide, which showed distances "between one town hall *130 to another". The record suggests that such charges may have been at the rate of $1.40 per mile which was multiplied by the number of miles thus arbitrarily computed. Central Delivery would compensate the driver in an amount equal to a percentage of the fees charged to its customers. The particular percentage was based upon the driver's seniority and performance. Only three percentages were involved: 50, 54, and 57. A newly hired driver was paid 50 percent. Petitioner had been hired in 1978, and by August 3, 1980, he became a 57 percent driver. Drivers usually maintained "scrupulous records" Although drivers were reimbursed for tolls, a driver's compensation, apart from toll reimbursements, was based solely on his applicable percentage of the aggregate fees paid by the customers, which in turn were directly related to the aggregate distances between pickup and delivery points computed in accordance with the standardized mileage guide. Such compensation was in no other way based upon the actual cost of operating the driver's vehicle or his time. It was conceivable that a driver's actual mileage could exceed the standard mileage. He could also incur expenses associated with the *131 business use of his vehicle in addition to the familiar "fuel and maintenance" charges. Such additional expenses would often include, for example, the cost of radio or beeper service. Until July 10, 1981, petitioner worked for Central Delivery as a contract driver and occasionally (on some weekends) as a "dispatcher", but on July 10, 1981, he became an "Operations Manager", the third highest position in Central Delivery's Boston operation. As a driver he regularly drove "line-haul[s]" and probably also did some demand work. Petitioner was considered a "competent" driver. He worked five days a week, 50 weeks a year. He traveled extensively each business day, generally covering a circular route starting in Massachusetts, into Connecticut, then back through Massachusetts into New Hampshire, and finally back again to Massachusetts. His daily billed travel could easily reach, or perhaps even exceed, 350 miles. As a contract driver, petitioner was regarded as an independent contractor, whose compensation was reflected in IRS forms 1099. As a dispatcher and as an Operations Manager, however, he was treated as an employee, whose compensation was shown on the familiar IRS forms *132 W-2. The only income he reported on his 1979 return was an item of $1,836.50 shown on a W-2 as wages received from Central Delivery as a part-time dispatcher. That W-2 disclosed Federal income taxes in the amount of $210.44 as having been withheld from petitioner's wages. The return reported no income tax due for 1979, and claimed a refund of the $210.44 withheld. That refund was in fact made. On his 1980 return, the only income petitioner reported was an item of $2,587.06, representing the aggregate of wages disclosed as having been received by him on three W-2s, one from Central Delivery in the amount of $589.50, the second from "The Wendworth Corp." in the amount of $200.60, and the third from "Sambo's North Dartmouth MA" in the amount of $1,796.96. These three W-2s reported Federal taxes withheld in the amounts of $60.34, $24.13, and $363.87, respectively, or a total of $448.34. The return showed no taxes due on the basis of the income reported, and claimed a refund of the $448.34 withheld. A refund in that amount was in fact made. Petitioner did not file any return for 1981, notwithstanding that he received some compensation in 1981 both as a contract driver and as an *133 "operations Manager". The Commissioner alleged that petitioner received non-employee compensation from Central Delivery in the amounts of $18,879.12 in 1979, $30,402.63 in 1980, and $22,470.10 in 1981. Petitioner did not report on his 1979 and 1980 Federal tax returns any of his non-employee compensation. Sometime in late November 1981, the Commissioner notified him concerning the amount for 1979. In his reply to this notification petitioner reportedly indicated that he had driven 124,600 miles and claimed auto expense deduction in respect of such travel. Thereafter, his "case" was assigned to one of the Commissioner's revenue agents.Petitioner met with this agent on August 2, 1982, after earlier cancelling an appointment scheduled for June 8, 1982. During the August 2, 1982, conference the agent asked petitioner why he had omitted the non-employee compensation from his returns. He "smiled kind of sheepishly" and explained that he had expenses which offset the income. Specifically, he asserted that he traveled approximately 100,000 miles each year in the course of performing services for Central Delivery. However, he did not provide any substantiation of the amount, even after *134 promising to do so. He did not suggest any other automobile-related expenses. It appears from the record that petitioner did not file a tax return for 1981, although he alleged otherwise. At the August 2, 1982, conference he did submit a purported photocopy of the original return. However, neither his name nor his signature appeared anywhere on the form. Nevertheless, it did show total income of $27,567.30, an amount only $9 higher than the amount that the Commissioner had determined that he had earned. The form also listed "[b]usiness" mileage totaling 137,000 miles and a "[t]otal" tax of $913. In the notice of deficiency, the Commissioner charged petitioner with having received as "Non-employee Compensation" the following amounts allegedly shown on forms 1099 as having been paid to petitioner: Year
Amount
1979
$18,879.12
1980
30,402.63
1981
22,470.10
The deficiency notice also included $29 in petitioner's 1979 gross income allegedly paid to him as wages by "For the Love of Pete, Inc.", and $5,088.20 in his 1981 gross income allegedly paid to him as wages by Central Delivery. Both of these amounts allegedly appeared on W-2s for the respective *135 years. The Commissioner at the same time allowed deductions for automobile expenses in the amount of $5,275 for 1979 and $5,750 for each of the years 1980 and 1981, based upon the standard mileage allowance [1] and a 40,000 mile business use mileage allowance. The agent had used the 40,000 mile figure on the basis of an assumed total actual travel of 250 miles a day from which the agent subtracted 90 miles as assumed commuting, leaving a figure of 160 miles a day as business travel. The agent then multiplied the 160 miles by 250 on the assumed basis of a 250-day work year to arrive at the 40,000 mile mileage allowance. In the deficiency notice the Commissioner determined increases in income as follows: 1979
1980
1981
Non-employee compensation
$18,879.12 $30,402.63 $22,470.10 Automobile expenses
(5,275.00)
(5,750.00)
(5,750.00)
Wages
29.00 5,088.20 Increase in Income
$13,633.12 $24,652.63 $21,808.30 *136 OPINION The basic deficiencies have already been established as a result of petitioner's default. There remains only the matter of the section 6653(b) additions for fraud, which must be proved by the Government in accordance with Miller-Pocahontas Coal Co. v. Commissioner,21 B.T.A. 1360 (1931), notwithstanding petitioner's default by reason of his total failure to prosecute. The Government has undertaken to carry that burden, but we have found its proof to be wanting. Section 6653(b) applies where "any part of any underpayment * * * of tax * * * is due to fraud" (emphasis supplied). Thus, the Government's burden is to establish -- "by clear and convincing evidence", -- Arlette Coat Co. v. Commissioner,14 T.C. 751, 756 (1950) -- not only that there has been fraud, but also that there was an underpayment, at least some portion of which was due to such fraud. "[A]ffirmative proof of an underpayment is a necessary part of the Commissioner's burden". Compton v. Commissioner,T.C. Memo. 1983-642, 47 T.C.M. 124, 127, 52 P-H Memo T.C. par. 83,642. *137 See also Castillo v. Commissioner,84 T.C. 405, 409 (1985); Hebrank v. Commissioner,81 T.C. 640, 642 (1983). It is in this latter respect that the Government's proof falters. Although we are reasonably satisfied that it has proved that petitioner's failure to report his contract driver's earnings as gross income was probably due to fraud, it has not established by clear and convincing evidence that such failure resulted in underpayments of tax. To be sure, as a consequence of petitioner's default, he must be held liable for the basic deficiencies. But the mere fact that he has failed to discharge his burden of proof (either at trial or by reason of default) to show that the Commissioner erred in determining the deficiencies may not be relied upon by the Government to carry its burden of proof as to underpayment. See George v. Commissioner,338 F.2d 221, 223 (1st Cir. 1964); Otsuki v. Commissioner,53 T.C. 96, 106 (1969). It is thus possible that both parties may fail in their respective burdens, Drieborg v. Commissioner,225 F.2d 216, 218 (6th Cir. 1955); *138 Doncaster v. Commissioner,77 T.C. 334, 337-338 (1981); Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971). In our view, the Government's proof was faulty and unpersuasive; it certainly did not constitute "clear and convincing evidence". The evidence discloses that petitioner traveled extensively each business day. His circular route ordinarily began in Massachusetts, into Connecticut, then back through Massachusetts into New Hampshire, and finally back again to Massachusetts. Prior to filing his petition herein, he had contended throughout the administrative consideration of his "case", that he had offsetting deductions for automobile expenses based on annual business mileage which he claimed at various times to be about or in excess of 100,000 miles, and more specifically, 124,600 miles for 1979, and 137,000 miles for 1981. In the determination of deficiency petitioner was allowed deductions for business use of his automobile which, the evidence shows, was based upon assumed annual business travel of 40,000 miles. The evidence further shows that such 40,000 mile figure was in turn based upon an assumption that petitioner's daily travel *139 amounted to 250 miles, from which there was subtracted 90 miles, assumed to represent nondeductible commuting, leaving only 160 miles of business related travel. But evidence at the trial, elicited from the Commissioner's own witness, the general manager of Central Delivery, made clear that petitioner's daily business travel could easily reach 350 miles. Further, the manager's testimony strongly suggests to us that the 350 figure was based upon the travel that was actually billed to Central Delivery's customers -- for it was only the latter figure that was of any interest to Central Delivery and it was that figure that appeared on the manifests submitted to Central Delivery by its drivers for use in billing its customers as well as compensating the drivers. Plainly, the evidence is not "clear and convincing" to the contrary, and in the circumstances there would be no compelling basis for us to conclude that the 350 figure must be reduced by anything for (noncompensable) commuting. In any event, there is certainly no evidence establishing a 90-mile a day commuting use of petitioner's automobile. Moreover, on the basis of the evidence, there could be a reasonable inference that *140 petitioner's daily business travel exceeded 350 miles. As indicated above, that figure, so far as this record reveals, probably represents billed travel. But it is entirely conceivable that after business travel from a pickup at point A to delivery at point B, petitioner's next pickup might be at point C. And since the use of his automobile from point B to point C would not represent billed travel (if he were not transporting anything for any customer from point B to point C or beyond), it would not be part of the billed travel reported in his manifest. Yet, that travel from point B to point C would certainly represent business use of his vehicle that may not have been included in the 350 figure. Although there might well be some explanation leading to the opposite conclusion, no such explanation appears in the record. At best, we find the Government's evidence in respect of petitioner's business travel to be cloudy. It is plain to us that petitioner's business use of his automobile was greatly in excess of the 160 miles a day assumed in the Commissioner's determination of deficiency. We cannot estimate the extent of such excess with any degree of assurance on this record. *141 Moreover, in addition to the usual costs of operating an automobile, the record indicates that petitioner could also reasonably have been expected to incur other automobile related expenses, such as, for example, the cost of radio or beeper service. The record is entirely too vague for us to conclude that the Government has come forward with clear and convincing evidence that there were underpayments of tax for each year in issue. [2] If the burden of proof were upon petitioner, we would probably find that he had failed to carry it on this record. But the burden, and a heavy one at that, was upon the Government. The record indicates quite plainly to us that petitioner's business travel covered a far greater aggregate distance than was conceded to him. We cannot conclude, on the state of the record before us, that any unreported income was not offset by allowable business travel deductions. *142 To be sure, we are aware of the well settled rule that, once the Government establishes the existence of unreported income and allows all the deductions claimed on a return, it does not have the further burden of proving the negative that the taxpayer did not have any additional deductions. See, e.g., United States v. Bender,218 F.2d 869, 871-872 (7th Cir. 1955) cert. denied 349 U.S. 920 (1955); United States v. Stayback,212 F.2d 313, 317 (3d Cir. 1954) cert. denied 348 U.S. 911 (1955). But that rule is not inflexible, and it may not govern where, as here, a specific deduction goes to the very heart of the case. Cf. Perez v. Commissioner,T.C. Memo. 1974-211, 33 TCM 946, 952, 43 P-H Memo T.C. par. 74,211. Although the conclusion that we reached above is dispositive of the fraud issue, the record also fails to establish the amounts of unreported gross income. There are no 1099s or W-2s in evidence showing the unreported items of income relied upon by the Commissioner in the notice of deficiency. And the *143 absence of the critical 1099s and W-2s in the record could be significant in respect of the fraud issue, even though petitioner did not appear to challenge the receipt of such compensation. Cf. Drieborg v. Commissioner,supra,225 F.2d at 217-219. [3] Although secondary proof of the amounts appearing on the 1099s and W-2s might have sufficed in this case, no such secondary proof was presented. Government counsel merely inquired cavalierly of a witness, the general manager of Central Delivery, whether "your records show 1099 income was paid to Howard Proctor", and "was W-2 income in the form of wages" paid to him in each of the years in issue. An affirmative answer to each of these questions hardly proves the amounts received by petitioner, nor indeed does it even pin down by year the amounts of "1099 income" or "W-2 income" received by petitioner. The only data in the record in respect of the amounts, by year, of petitioner's "1099 income" or unreported "W-2 income" are to be found in the notice of deficiency. But the determination of deficiency is not evidence, and the Commissioner cannot pull himself up by his bootstraps in this connection, and certainly *144 not in a fraud case. See Drieborg v. Commissioner,supra,225 F.2d at 219. Simply put, one cannot evade what he does not owe, "no matter how hard" he tries. 4 B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 114.3.4 (1981). Admittedly, petitioner was an intelligent person and a competent driver who would probably not continue to work without earning any income. However, this raises, at best, a concern that he earned some income but in no way establishes, by "clear and convincing" evidence, the requisite underpayment. A final word. This is a default case. Petitioner failed to appear both at calendar call and at the time the case was set for trial. We dismissed the case in respect of the basic deficiencies by reason of the default. However, it had been estabflished some 54 years ago that the addition for fraud cannot be approved in the case of a default by the taxpayer where the Commissioner fails to prove the essential components of the addition for fraud. Miller-Pocahontas Coal Co. v. Commissioner,21 B.T.A. 1360 (1931). *145 It was there emphasized that the burden of proof as to the statutory "addition" for fraud (referred to in the opinion as a "penalty" [4]) was placed upon the Commissioner, and that his failure to carry that burden must result in a decision for the taxpayer in respect of that issue. In accordance with Miller-Pocahontas and the various cases which have since followed it, the Commissioner undertook to discharge the burden here. However, there is a burden of proof upon one party or the other in respect of every issue in every case, and further reflection may well indicate serious doubt whether decision should not be entered against a defaulting party on all issues raised by him when he invokes the jurisdiction of this Court, and then fails completely to prosecute his case in all respects. However, the rule has been otherwise in this Court, *146 and the Commissioner has undertaken to discharge the burden that he is thought to bear. In the circumstances, under the compulsion of Miller-Pocahontas, we in turn have undertaken to examine in detail the Commissioner's evidence, and have concluded that he has failed to carry that burden, notwithstanding that we have a strong suspicion that there was at least part of an underpayment for each year in issue that was due to fraud. To reflect our order granting the motion for default judgment against petitioner in respect of the basic deficiencies, Decision will be entered for respondent in respect of the basic deficiencies and for petitioner in respect of the section 6653(b) additions for fraud.
Footnotes
1. In lieu of determining actual costs when figuring the amount allowable as a deduction in respect of the business use of an automobile or similar vehicle, a taxpayer may take a "standard" deduction, based upon the number of miles the vehicle is driven during the year for business purposes. For the years in issue, the per-mile of use allowances were as follows: 1979
1980-81
First 15,000 miles
18.5"
20"
Miles in excess of 15,000
10
11
Rev. Proc. 82-61, 1982-2 C.B. 849, modified by Rev. Proc. 83-74, 1983-2 C.B. 593; Rev. Proc. 80-7, 1980-1 C.B. 590↩.
2. The Government has offered an alternative approach on brief to show a low mileage figure for petitioner's business travel, with a resulting allowable deduction for each year that is even less than was allowed in the deficiency notice. Pursuant to that approach, a computation is first made to ascertain petitioner's per-mile earnings figure for each year by multiplying $1.40 (the assumed fee per mile charged Central Delivery's customers) by the compensation percentage (50, 54, or 57) assumed to be applicable to petitioner for each year or portion of each year. A further computation is then made to determine petitioner's annual mileage by taking into account the amounts of compensation assumed to have been paid to petitioner based on the amounts allegedly appearing on the 1099s (which were not in evidence) and his per-mile earnings figure as calculated above. By use of this method the brief computes petitioner's mileage as 27,970 for 1979, 26,802 for 1980, and 12,541 for 1981. As a consequence, the resulting deductions would be even less than the deductions allowed in the deficiency notice based on 40,000 miles a year. However, the foregoing method is based on various assumptions, some of which are subject to wide margins of error, and the resulting possible errors, when compounded, could render highly unreliable any conclusions derived from these computations. We reject the inference that such computations suffice, or even convincingly support, the view that the Government has proved its case.↩
3. We note that the opinion in Drieborg was written by Judge Stewart↩ who later became a Justice of the Supreme Court of the United States.
4. The use of the word "penalty" to refer to what Congress called an "addition" to tax has since been open to serious doubt at least since the Supreme Court's subsequent opinion in Helvering v. Mitchell,303 U.S. 391, 398-404↩ (1938).